McRee's Adm'rs v. Means.

---

## McREE'S ADM'RS *vs.* MEANS.

[BILL IN EQUITY TO ESTABLISH PRECATORY TRUST, FOR ACCOUNT, &C.]

1. *Precatory words in will construed.*—The words, " But, should my said husband" (who was made sole residuary legatee) "die without issue of his body, *it is my wish and will he shall give* all of said property to R.," create a precatory trust in favor of R.
2. *Repugnancy.*—It is a settled principle of law, that an absolute power of disposition or alienation in the first taker defeats a limitation over by way of executory devise ; but this principle does not invalidate a remainder, by way of executory devise, limited upon the death without issue of his body of the first taker, to whom the property was bequeathed, " to have and to hold to him, his heirs and assigns forever, to his use, behoof and benefit, in fee simple."

McRee's Adm'rs v. Means.

3. *Enlargement of life estate into fee by implication.*—The established doctrine, that a charge for the payment of debts or legacies, on the person of a devisee whose estate is undefined, enlarges his estate into a fee by implication, does not apply to a residuary bequest of the " balance" of the testator's property after payment of a legacy in money to another ; the payment of the legacy in money being a charge on the estate, and not on the person of the residuary legatee.

4. *Remoteness.*—The word *remainder*, as used in section 1302 of the Code, includes executory devises ; consequently, an executory devise, limited to take effect on the death of the first taker " without issue of his body," whatever might have been its effect at common law, is not void for remoteness under the Code.

APPEAL from the Chancery Court of Lowndes.
Heard before the Hon. WADE KEYES.

THE material facts shown by the record are these : Caleb P. McRee and Martha Ann Burt were married, in this State, on the 17th January, 1847. At the time of said marriage, Mrs. McRee owned a considerable separate estate, which consisted of lands, slaves, stock, and other things appertaining to a cotton plantation, money, choses in action, &c. Mrs. McRee died about the 1st March, 1855, having made and published her last will and testament, dated the 15th August, 1854, which was duly admitted to probate in Lowndes county after her death, and which contained the following provisions : " 1. It is my will, wish, and desire, that all just debts due by me, or on account of my estate or property at my death, be promptly paid by my executor, hereinafter named. 2. I give, bequeath and devise unto Robert P. Means the sum of $5,000, to be paid him, the said Robert, in five annual payments, computing from my death as to time. 3. I give, bequeath and devise all the balance of my property and estate, both real, personal and mixed, also all choses in action and chattels, to my beloved husband, Caleb P. McRee, to have and to hold said property and estate, real, mixed, personal, choses in action, and chattels, to him, the said Caleb P., his heirs and assigns forever, to his use, behoof and benefit, in fee simple ; but, should my said husband die without issue of his body, it is my wish and will he shall give all of said property to Robert P. Means. 4. I hereby constitute and appoint my said hus-

band, Caleb P. McRee, executor of my last will and testament," &c. C. P. McRee duly qualified as the executor of his deceased wife,. took possession of all the property, paid off the debts, together with two installments of the pecuniary legacy to Means, and died in October, 1857,. intestate, and without issue of his body. Letters of administration on his estate were soon afterwards granted to James C. McRee and Andrew B. Hurst, who took possession of the entire property, and claimed it as belonging to the estate of their intestate. Robert P. Means there-upon filed his bill against them, claiming the property under the third clause of Mrs. McRee's will, above copied, asking an account, &c. The chancellor, on final hearing, rendered a decree in favor of the complainant, which the defendants now assign as error.

WATTS, JUDGE & JACKSON, for appellants.—If Means takes at all under the third clause of the will, he must take as executory devisee : he cannot take as a contingent remainder-man. We contend, that no trust is created in his favor, for the following reasons :

1. To create a trust of the character here contended for, the words used must be imperative on the. first taker: they must leave him no discretion or choice; and if it is not apparent from the whole will that the words, whatever they may be, were intended to be imperative, no trust is thereby created.—2 Story's Equity, § 1070, and authorities cited in note 2 ; 2 Spence's Equity, 67–69, and notes. The language of the clause here relied on, especially when taken in connection with other parts of the will, is not necessarily imperative. According to the modern English rule, and certainly according to the rule in Alabama and other States, the words must be construed in their plain, common-sense meaning, and will not be construed into a trust, unless the context irresistibly forces to such a construction.—2 Story's Equity, §§ 1069–70; Sale v. Moore, 1 Sim. 534; Meredith v. Hineage, 1 Sim. 543; Webb v. Woolls, 13 Eng. Law & Eq. 63; Pennock's case, 20 Penn. St. R. 268; Gilbert v. Chapin, 19 Conn. 342; Green v. Marsden, 21 Eng. Law & Eq. 538; Jackson

v. Robbins, 16 Johns. 537; Jackson v. Bull, 10 Johns. 20; Ellis v. Ellis, 15 Ala. 296. This last case follows Story, Kent, and other American authorities. In Sale v. Moore, *supra*, the vice-chancellor said, "The first case that construed words of recommendation into a command, made a will for the testator. The current of decisions, of late years, has been against converting the legatee into a trustee."

The will shows that the testatrix knew the difference between words of wish, desire, request, or recommendation, and words of imperative and commanding nature. In the 2d clause of the will, speaking of the legacy of $5,000 to Means, she says, "I give, bequeath and devise," &c.; and in the 3d clause she uses similar language. The chancellor says, that the words *will, wish and desire*, as used in the first clause in reference to the payment of debts, are certainly imperative; and that, therefore, the same words must be understood in the same sense as used in the 3d clause. But this by no means follows, even if the words in the 1st clause are imperative. In the 3d clause, they really amount to nothing, unless they qualify the word *property*, therein used; for the law made it the imperative duty of McRee, as executor, to pay the debts, &c., and no words of the testatrix could add to the imperative nature of this duty. The words *will, wish and desire*, in the first clause, are not imperative; they simply express the strong desire of the testatrix that the debts should be promptly paid, and, therefore, were not used as a command. Neither *will*, nor *wish*, is, of itself, necessarily imperative. The latter is certainly the reverse of imperative; and the former, according to Webster, does not necessarily mean command. The definitions given by him are—1st, a faculty of the mind; 2d, choice, determination; 3d, choice, discretion, pleasure; 4th, command, direction; 5th, disposition, inclination, desire. The words themselves of the clause, apart from the context, are not imperative. Does the context make them more or less imperative? If she used those words as a command, why should she say, "*he* shall *give*?" If she intended, absolutely and unqualifiedly, that Means should have the

property on the death of her husband without issue of his body, why should she leave anything to be done by her husband? Why not say so in terms plain and unmistakable? The use of the word *give*, in the connection here found, implies the most absolute power over the subject of the gift. He could not *give*, unless the property belonged to him. Did the testatrix intend by this language that, in making the gift, McRee should act as her executor, or as husband and first taker? If as executor, the devise over would certainly be too remote.—Miller v. McComb, 26 Wendell, 229. If she intended that, in making the gift, he should act as first taker, this necessarily implied the power of disposition, which would defeat the executory devise. If Means takes at all, he must take as purchaser from the testatrix; if he takes by the gift of C. P. McRee, he does not take as purchaser under the will.

The language used in creating the estate in McRee, shows that the testatrix did not intend the words, *wish*, *will*, &c., to be imperative on him. She gives him her *estate* in the property, which implies everything over which she had dominion. She does not convey to him for lif , or for any term of years; but to him, "his heirs, and assigns forever;" not to the use or trust of any other person, but "to his use, behoof and benefit, in fee simple." She conveys to him property which was of a perishable nature, and which must have been consumed in its use. She makes no distinction between that which is permanent and imperishable, and that which is not. Did she intend that *he* should give that which had been consumed in its use, or that which he had already sold, given away, transferred, or otherwise disposed of? All this he had a right to do, unless we strike from the context the words, *estate, assigns, use, behoof and benefit, in fee simple.* If the absolute property is given to the first taker, the strongest expressions of will, wish, recommendation or request, cannot be held imperative; and so if any words are used, by which it is expressed, or from which it may be implied, that the first taker may apply any part of the subject to his own use, or may destroy or dispose of it.

Is it more probable that the testatrix intended to give the absolute property to her husband, with a request that he would give, &c., or that the words *wish and will* should imperatively qualify and control the strong words giving the estate to her husband? Which set of words is the stronger, "*will* and *wish*," or "*estate*," "*to him, his heirs and assigns forever, to his use, benefit and behoof, in fee simple*? We think it clear that the latter, giving the whole estate to her husband, are stronger than the former words. The former words, taken in their plain, common-sense meaning, are simply the expression of a strong desire that her husband, in case he should die without issue, should give the property to Means. They were intended as mere moral suggestions, to excite and aid the discretion which her husband had over the property, and not to control and govern that discretion. She intended to leave it to the good will and pleasure of her husband to dispose of this property as he might choose; but, in the event of his having no issue, she strongly wished him to consider that her kinsman, Means, was an object of her good will, and, in remembrance of this, to center his good will and bounty on Means.

If there is any trust in this case, it is an implied trust. In Webb v. Woolls, *supra*, there was an express trust; but, because of several strong words used in giving the estate to the first taker, the trust was held repugnant to such estate, and therefore void. If an express trust was held void for such reasons, *a fortiori* an implied trust cannot be upheld.—Authorities cited *supra;* also, Knight v. Knight, 3 Beavan, 175; Greenleaf's Cruise, vol. 3, note 2, p. 367, and authorities cited; 2 Spence's Equity, 69–70, and notes; Huskisson v. Bridge, 2 Eng. Law & Eq. 180; 1 Vesey, sr. 9; Williams v. Williams, 5 Eng. Law & Eq. 47; 2 Hill's Ch. 490; 14 Sim. 378; Green v. Marsden, 21 Eng. Law & Eq. 538.

2. The absolute estate being given to C. P. McRee, the subsequent limitation over is void for repugnancy.—Authorities above cited; also, Flinn v. Davis, 18 Ala. 132; Allen v. White, 16 Ala. 181; Denson v. Mitchell, 26 Ala. 360. In the case last cited it is said, that the only excep-

tion to the rule, that a power of disposition in the first taker is destructive of an executory devise, "is where an express life estate or term of years is given." Smith v. Bell, 6 Peters, which is cited by the appellee's counsel, is based expressly on the ground, that an estate for life only was given to the first taker. On the same point see, also, Patterson v. Weathers, 30 Ala. 404; 2 Story's Equity, §§ 1069–70, 1073; Bull v. Jackson, 10 Johns. 20; Jackson v. Robbins, 16 Johns. 537; Pennock's case, 20 Penn. State R. 268; Webb v. Woolls, 13 Eng. Law & Eq. 63; Knight v. Knight, 3 Beavan, 176; 1 Vesey, 270, and note 3; Sale v. Moore, 1 Sim. 542; Meredith v. Hineage, 1 Sim. 552; 3 Vesey, 7; McLean v. McDonald, 2 Barbour's (S. C.) R. 535; Ferris v. Gibson, 4 Edw. Ch. 707; Gilbert v. Chapin, 19 Conn. 342; Davis v. Bridgman, 2 Yerger, 558; Williams v. Jones, 2 Swan, 620; Sevier v. Brown, 2 Swan, 112; Elton v. Eason, 19 Vesey, 78; Lewis on Perpetuities, 322, 362. Even where a life estate only is given in express terms to the first taker, coupled with a general power of disposition, he takes the absolute property, and a limitation over is void.—19 Vesey, 86; and authorities cited in note; Davis v. Richardson, 10 Yerger, 290. It may be conceded, that an executory devise may be limited on a mere fee; but it cannot be limited on a fee simple absolute. A fee, in modern English tenures, signifies an estate of inheritance; but a fee simple imports an absolute inheritance, clear of any condition or limitation whatever, and, when not disposed of by will, descends to the heirs generally.—Patterson v. Ellis, 11 Wendell, 278; 1 Bla. Com. (m. p.) 106; Lewis on Perpetuities, 322, 362; Elton v. Eason, 19 Vesey, 78. Personal property may be limited over after a life estate, but not after a gift of the absolute property. If the absolute property, or the right of disposition, is given to the first taker, the limitation over is void; because the first taker has, in either event, the right of destroying the limitation over, and this right is inconsistent with the existence of an executory devise. And it makes no difference whether the power of disposition is express or implied, nor whether it has been exercised or not.—Au-

thorities *supra ;* 2 Kent's Com. 352; Cuthbert v. Purrier,
4 Cond. Eng. Ch. 191; Brown v. Gibbs, 1 Russ. & My.
614; Keyes on Chattels, §§ 73, 146; Cook v. Walker,
15 Geo. 457; Bardswell v. Bardswell, 9 Sim. 319; Pope
v. Pope, 10 Sim. 1; Curtis v. Rippon, 5 Madd. 434; Jack-
son v. Bull, 10 Johns. 20; Newland v. Newland, 1 Jones'
Law Rep. 463; 2 Story's Equity, § 1070; 2 Spence's
Equity, 68, 69, and notes; Bland v. Bland, 2 Cox, 351;
Fitzg. 8; 2 Vesey, 531.

What ownership, then, what power, did C. P. McRee
have over the property? If the dictionaries of the Eng-
lish language were searched for the strongest terms to
express absolute and uncontrollable ownership, stronger
terms than are here used could not be found. The word
*estate* imports the most absolute ownership.—Jackson v.
Robbins, 16 Johns. 537; Knight v. Knight, 3 Beavan, 176.
The testatrix not only gives him her *estate* in the property,
but " *to his heirs and assigns forever ;*" and not merely to him
and his assigns during life, or for a term of years, but " *to
his use, benefit and behoof, in fee simple.*" We are bound to
give effect to each word in the will, and to suppose that
the testatrix meant something by each word, and to
enforce the intention thus ascertained, if that intention
be legal. Independent of other strong words, importing
the most unlimited, unfettered, and uncontrollable own-
ership, the word *assigns* implies, *ex vi termini,* the right
to sell, give away, or dispose in any other manner of the
estate given to him. It is defined by Bouvier to mean,
" those to whom rights have been transferred by particu-
lar title, such as sale, gift, legacy, transfer, or cession."
See, also, Webb v. Woolls, *supra,* in which the effect of
the word is argued. By the use of this word, the testa-
trix necessarily empowered her husband to sell or give,
either by deed or by parol, to will or to transfer the prop-
erty, whensoever, howsoever and to whomsoever he
might think proper. And all this strong language, be
it remembered, is employed in reference to property which
must be consumed in the use, as well as to that of a per-
manent and imperishable nature. McRee certainly took
an absolute estate in the property which was of a perish-

McRee's Adm'rs v. Means

able nature; and inasmuch as the same language is used in reference to each kind of property, it must be presumed that the testatrix intended McRee to take the same interest and estate in each kind.—2 Spence's Equity, 149; 2 Jarman, 362; 2 Russ. & My. 567. If McRee had sold or otherwise disposed of any part of the property, or the whole of it, Means could not have recovered it. His power of disposal was general, and would have enlarged a life estate into an absolute one.—Authorities on this point *supra;* 10 Yerger, 290; 6 Gill & John. 171. He certainly had the right to use and destroy that portion of the property which was of a perishable nature; and in such case the executory devise fails.—2 Vesey, jr., 531; Bland v. Bland, 2 Cox, 351; 1 Jones' Law R. 463; Fitz. 8.

3. The general intent, if legal, must be enforced at the sacrifice of the particular intent.—2 Spence's Equity, 67. In this case, the great and general intent of the testatrix was to benefit her husband; he was the prime object of her affections, and of her bounty. Now, if Means takes this property, that intent will be defeated. By taking under the will, and paying off the debts and a part of the legacy, McRee made himself personally responsible to Means for the balance, and his estate is liable for the entire unpaid portion.—Olmsted v. Harvey, 1 Barb. 113; Trent v. Trent, 1 Gilm. 174; 2 McCord, 395; 1 Edw. 201; 13 Gratt. 171. Five years would be required to pay the pecuniary legacy to Means. Out of what fund—the *corpus,* or the income of the property—were this legacy and the debts to be paid? The debts have been paid, and the legacy is a charge on McRee's estate. If Means can now recover the property, the effect will be to bankrupt McRee's estate. How, then, has McRee or his estate been benefited by the bounty of the testatrix?

4. But, admitting that the testatrix intended to create a trust in favor of Means, that the words are imperative, and that there is no such repugnancy as will defeat the trust, it is nevertheless insisted that the limitation over is void for remoteness. It is now too well settled to admit of argument, that the words, "*issue of his body,*" imply an indefinite failure of issue, unless their meaning is

restricted by something else in the will.—Landman v. Snodgrass, 26 Ala. 593 ; Ewing v. Standifer, 18 Ala. 400 ; Powell v. Glenn, 21 Ala. 458 ; Darden v. Burns, 6 Ala. 362 ; Hamner v. Smith, 22 Ala. 433 ; Isbell v. Maclin, 24 Ala. 315 ; 1 Barbour, 565 ; 2 Rich. Eq. 142 ; 4 Grattan, 16 ; 4 Barbour, 419 ; 8 Iredell, 25 ; 4 Edw. Ch. 707 ; 8 Iredell, 133 ; 3 Rich. Eq. 271 ; 3 Md. Ch. 272 ; 8 Rich. 307 ; 12 Grattan, 425 ; 26 Wendell, 229 ; 11 Wendell, 259 ; 20 Eng. Law & Eq. 234. There is nothing in this will to restrict or explain the meaning of the words, and the case falls within none of the recognized exceptions to the general rule.—26 Wendell, 229 ; 2 Jarman, 319–22 ; 2 Roper on Legacies, 1555 ; 8 Sim. 22 ; 11 Eng. Ch. 303. Nor does any provision of the Code change this construction. Technical words, when used in the Code, must be understood to have been used in their technical sense, unless the contrary is clearly shown.—*Ex parte* Vincent, 26 Ala. 145. The word *remainder*, as used in section 1302, does not include executory devises. Section 1301, and other portions of the Code, show that the law-makers knew and recognized the distinction between remainders and executory devises, and would not have used one term alone when they meant to include both.

5. The cases cited by the appellee's counsel, when examined, will not answer the argument and authorities on which we rely. Wall v. Mallard, 11 Eng. Law & Eq. 4, was an express trust, and there were no words in the first gift absolutely inconsistent with the trust for the children. Harrison v. Harrison, 2 Grattan, 14, was not an executory devise, but a vested remainder, and so held by the court. Hill v. Hill, 4 Barbour, 427, was based on a provision in the will requiring the payment of sums of money to the devisees when they became of age, which was held to restrict the meaning of the otherwise indefinite words. Cole's case, 18 Barbour, 384, was precisely in principle like the case of Hill v. Hill. In Chrystie v. Phyfe, 22 Barbour, 195, the devise over was to vest in the event that the daughter died unmarried, and left no child her surviving.

D. W. Baine, and Jno. A. Elmore, *contra.*—1. The first question in the case is, whether the testatrix intended to create a trust in favor of Means, on the death of her husband without issue; and in the determination of this question we should, in the first place, look to the words used, to see whether they are, of themselves, sufficient to create a trust; and, secondly, see whether there is anything in the context sufficient to change their effect.

Are, then, the words themselves sufficient to create a trust? The only rule invoked on this point, is one which is admitted by all the authorities, both ancient and modern, English and American; it is, that if the words, in their natural, ordinary and familiar sense, show that the testator intended that the trust should be executed, and not that it should be left to the mere discretion of the first taker, then a trust is created.—Ellis v. Ellis, 15 Ala. 302; Harrison v. Harrison, 10 Sm. & Mar. 471; Gilbert v. Chapin, 19 Conn. 351. In determining what intention is disclosed by particular words, it is an unsafe rule, ordinarily, to rely much on adjudicated cases, unless the precise words in controversy were construed; for " will cases have no brothers," and the law of one will is never the law for another different will. But, when we find a large number of concurring decisions, all holding language confessedly weaker in effect sufficient to create a trust, these cases will furnish a strong argument why the same effect may safely be attributed to far stronger words; and English cases, so far as they have not been overruled or impaired by modern decisions, may be safely relied on. The utmost extent of the modern authorities has been to repudiate all cases in which words, expressing in their ordinary import a simple recommendation, hope or confidence that the trust might be executed, but leaving its execution to the discretion of the first taker, have been held to create a trust; and the ground of this repudiation is, that to make a trust imperative, which was intended to be discretionary, is just as much a violation of the testator's intention, as to make a trust discretionary which was intended to be imperative.—2 Story's Equity, § 1069. Leaving out of view, then, all the cases which could fairly

come within the discarded decisions, we cite the follow-
ing, as a few of the instances in which far weaker words
have been held to create a trust: Harrison v. Harrison,
2 Grattan, 14; Lucas v. Lockhart, 10 Sm. & Mar. 471;
Hunter v. Stembridge, 12 Geo. 194; Tolson v. Tolson,
10 Gill & John. 159; Malim v. Keighley, 2 Vesey, jr. 334;
Pierson v. Garnett, 2 Bro. C. C. 230; Eels v. England,
2 Vernon, 466; Forbes v. Bull, 3 Mer. 436. On the other
hand, no case has been cited, in which words as strong as
those now under consideration have been held insufficient
to create a trust. •

Passing from the authorities, to a consideration of the
scope and effect of the words themselves: It is asked, if
the testatrix intended the trust to be imperative, why
make any trust at all? why not give the property directly
to Means? It might as well be asked, on the other side,
why insert this clause in the will at all, if the testatrix
did not intend that it should be acted on? But it is a
full answer to the question to say, that the law never
inquires, in construing a will, whether there was not some
plainer or easier way for the testator to have reached the
end proposed. If it did, every clause in a will would be
held void, if the supposed intent could have been better
executed in some other way. No court ever construed
and gave effect to a will, where it could not have pointed
out some simpler road to the result intended by the testa-
tor. If the clause now in question was intended to be
discretionary, we might reasonably expect that discretion-
ary words would have been used. Is that the character
of the words, "wish and will that he shall give," when
taken in their ordinary and familiar sense, and considered
in connection with the circumstances under which they
are used? They are used in an instrument which pur-
ports to be a testamentary disposition of property. What
is the ordinary and familiar meaning of the word *will*,
when used under these circumstances? Whether called
directory or imperative, it means that degree of determi-
nation which is sufficient to carry the property in the di-
rection indicated, and is so apt and appropriate to describe
such determination, that it has given a name to testa-

mentary dispositions of property. A will is so called, because it expresses *the will* of the maker as to the direction which his property shall take. In this case, the testatrix commences her will with the words, "*It is my will, wish, and desire;*" evidently using them as testamentary words, fit and appropriate to express that degree of determination which would insure an execution of her intention; and when she afterwards uses the words, "*It is my wish and will,*" the fair presumption is, that they were used in the same sense. The word *shall,* also used in the clause, points strongly to an imperative intention; importing, according to the dictionary and common usage, command and determination, and being utterly inconsistent with the idea of discretion. If the testatrix intended to make a mere moral suggestion or recommendation to her husband, to be acted on or not at his discretion, it is strange that she should have selected words which, in their ordinary sense, are imperative, and which she had herself used in an imperative sense, in the commencement of her will. If a person, having the power to command another, should say to him, 'It is my will that you shall do this thing,' this would certainly be deemed imperative by all reasonable rules of construction.

If, then, the words of the clause are sufficient to create a trust, is their effect destroyed by the preceding sentences of the will? It is an old and well-settled rule of construction, that every clause and word in a will must, if possible, receive such a construction as will reconcile it with every other word and clause. If the clause here in controversy creates a trust, its force and effect cannot be destroyed by any other clause, at least until all reconciliation between them becomes impossible. If the previous estate given to McRee, "his heirs and assigns," were of an absolute character, this would not prevent the trust from being upheld, if the words creating it are imperative.—See the cases cited by the chancellor on this point. But it is confidently insisted, that the absolute character of McRee's estate is perfectly consistent with the trust in favor of Means. In this point of view, the

24

words which seem to enlarge McRee's estate are entitled
to no weight; because, when a fee is given by deed or
will, its ampleness cannot be increased by any words
giving an express or implied power of disposition. An
unlimited power of disposition is a legal incident of every
fee; and this applies as well to a conditional and qualified
fee simple, as to an absolute fee simple,—the only dis-
tinction between them being in "the perdurableness of
the same."—1 Co. Litt. 583. The simple question, then,
is, whether there is any inconsistency between a previous
fee and an executory devise limited thereon upon a con-
tingency; and the mere statement of this question is its
own solution. The words creating the fee are referred
and give character to the estate in the event the contin-
gency never happens, while the words creating the devise
over apply to and fix the character of the estate in the
event the contingency does happen.

To apply these principles to the case at bar : Full power
and effect are attributed to all the words used in vesting
the estate in McRee, by construing them as a description
of the fee which he was to take; and full force and effect
are allowed to all the words used in the devise over, by
construing them to operate only on the happening of the
contingency which defeats the previous estate. This
construction harmonizes every word and clause in the
will, and no other construction does; it carries out the
whole intention of the testator, and no other does. The
case of Webb v. Woolls, cited for appellants, and other
similar cases, holding that the absolute character of the
previous estate must be looked to for the purpose of re-
straining the subsequent words raising the trust, are thus
shown to be inapplicable. In those cases, there was no
previous fee given, which was merely made defeasible on
the happening of a contingency on which the trust was
to take effect : in all of them, the trust, if valid, must be
executed at all events; and hence the previous absolute
estate was in no event consistent with the trust. But
here the case is different: the previous absolute estate
has its full scope and operation, except in the single event
of the happening of the contingency which is to defeat it;

the trust is not to operate at all, until the previous absolute estate has ceased to exist. The case of Pierson v. Garnett, 2 Bro. C. C. 225, in which the same argument was made as to the force of the previous absolute estate, is precisely in point.

It is argued, that the pecuniary legacy to Means is a charge upon McRee's estate, to discharge which may require a greater estate in McRee than is given him by the construction above contended for. But the vice of this argument is two-fold : In the first place, the rule invoked does not apply, where the ulterior interest is limited to the same party who is entitled to the previous charge; and, in the next place, the entire estate is not given to McRee subject to the charge, but the $5,000 is first set apart to Means, and the balance then given to McRee subject to no charge.

2. There is no repugnancy between the estate of McRee and the devise in favor of Means. The doctrine of repugnancy only applies, where the absolute estate is first given, and the testator then attempts to give an ulterior interest in the same property to another, while leaving the first estate in its full operation and ampleness; as where a fee is given to A., with remainder in what he dies possessed of to B. It never applies to a case in which the subsequent limitation operates as an infringement upon the fee previously given.—Hill v. Hill, 4 Barbour, 427 ; Chrystie v. Phyfe, 22 Barbour, 218 ; Theological Seminary v. Cole, 18 Barbour, 376 ; Smith v. Bell, 6 Peters, 76.

3. The limitation over in favor of Means is not void for remoteness. The doctrine as to remoteness is, that whenever the testator shows an intention to make the words, "dying without issue," &c., relate to the death of the first taker, the event is not too remote ; and where the failure of issue is combined with an event personal to the first taker, this is a sufficient indication of such intention.—Hill v. Hill, 4 Barbour, 425 ; Doe d.. Neville v. Rivers, 7 Term Rep. 277 ; 1 Fearne on Remainders, 482 ; 2 Roper on Legacies, 1555. Moreover, whatever may be the effect of the common-law doctrine of remoteness, section 1302 of

the Code fixes the meaning of the words here in contro-
versy. That section, which must receive the liberal con-
struction applied to all remedial statutes, construed in
connection with other provisions of the Code, must be
held to embrace executory devises.—Winchester's case,
3 Co. 4; Alexander v. Worthington, 5 Md. 485; 12 Geo.
530; Sedgwick on Statutes, 238, 317.

A. J. WALKER, C. J.—The will of Martha Ann
McRee contains a clause in the following words: "3d.
*I give, bequeath and devise all the balance of my property and
estate, both real, mixed and personal; also all choses in action,
and chattels, to my beloved husband, Caleb P. McRee, to have
and to hold said property and estate, real, mixed, personal, choses
in action and chattels, to him, the said Caleb P., his heirs and
assigns forever, to his use, behoof, and benefit, in fee simple.
But, should my said husband die without issue of his
body, it is my wish and will, he shall give all of said
property to Robert P. Means.*"

Caleb P. McRee having died intestate, and without
descendants, the title to the property bequeathed to him
depends upon the question, whether there is a valid limi-
tation over to Robert P. Means; and that is the question
of this case.

[1.] In the investigation of the question just stated, the
first point of inquiry which presents itself, is, whether the
words, "it is my wish and will he shall give all of said
property to Robert P. Means," left it discretionary with
McRee to give or not to give to Means, or imposed it
upon him as a duty to give the property; or, in other
words, whether the testatrix has simply made a sugges-
tion or recommendation, which might be obeyed or dis-
obeyed, or has created an obligatory trust, which a court
of chancery will enforce. The intention of the testatrix,
as deduced from the words themselves and from the con-
text, must control this, as it should all other inquiries
involving the construction of wills. In our argument
we shall adopt, without questioning or affirming its cor-
rectness, the principle, that the words are to be under-
stood "in their natural, ordinary and familiar sense," and

will not attempt to draw from the ancient English cases any artificial rule for their construction.—Ellis v. Ellis, 15 Ala. 296; 2 Story's Eq. Jur. § 1069.

What, then, is the natural, ordinary and familiar sense of the words "wish and will?" Do they import an imperative requisition that McRee should give the property to Means, or are they merely significant of a moral suggestion to that effect? The two words, "wish and will," are both employed by the testatrix in the order in which we present them. She first expresses her "wish," and then her "will." The former of the two words, in its common acceptation, is better adapted than the latter to convey the idea of a request made, which may or may not be granted. That, perhaps, is the sense in which it is most generally used in conversation. But the testatrix has not stopped with the use of this word, significant of petition. She has added another and more emphatic word, "will." The question, why was she not content with the former or the two words, is suggestive of the conclusion, that it was designed to add the mandate of one having a right of command to the force which a mere request might carry. And that consideration is the more significant, because the additional word was, at all events, unnecessary, if it was designed to make a compliance with her request a discretionary matter.

*Will* is sometimes used as the synonym of choice, wish, pleasure; but it is also used frequently in the sense of command, direction, determination, and resolution. It has, when found in testamentary papers, a universally received mandatory signification. Swinburne's definition of a testament is, "a just sentence of our *will*, touching that we would have done after our death."—1 Swin. on Wills, 4. Again, the same author says, (page 19,) "the *will*, or meaning of the testator, is the queen or empress of the testament." The same definition is also given by other authors.—10 Bacon's Abr. 479, Bouvier's Law Dictionary.

In Gilbert v. Chapin, 19 Conn. 351, the word *will* is used in contra-distinction to precatory language, as will be seen by the following quotations. "It is said that preca-

tory language, or words of recommendation, are expressive of a testator's *will* and intention. It is true that such forms of expression declare a *wish*, a *preference*, but not a *will* in its appropriate sense. They express an intention, or rather a desire, not absolutely, but with a qualification or condition, that such desire shall nevertheless be subject to the future discretion and action of the devisee. And the distinction between this and an *imperative direction*, which, in legal parlance, is a *will*, is very intelligible and clear." This extract indicates an opinion of the Connecticut court, that "will" is the antithesis of words of recommendation and request, not creating a trust, and carries with its use an imperative direction.

The same meaning has also been attributed to the word in South Carolina, where it is spoken of and distinguished from "wish."—Brunson v. Hunter, 2 Hill's Ch. 490. Chief-Justice Marshall had the same view of the import of the word, for he said : " The first and great rule in the exposition of wills, to which all other rules must bend, is, that the intention of the testator, expressed in his will, shall prevail, provided it be consistent with the rules of law. This principle is generally asserted in the construction of every testamentary disposition. It is emphatically *the will* of the person who makes it, and is defined to be the declaration of a man's intentions, which he *wills* to be performed after its death."—6 Bacon's Abr. 16 ; also, 2 Black. Com. 499 ; Eels v. England, 2 Vernon, 466 ; Forbes v. Ball, 3 Mer. 436.

The common acceptation of the word *will* corresponds with the meaning adopted by law-writers. There is no other word of more common and familiar use to describe the mental operation involved in the act of making a bequest of property. While the books abound in cases, where words less imperative than *will* have been held to create trusts, we have not found, and the industry of counsel has not produced, a single case in which "*will*" has not been treated as mandatory. The word "will," we decide, therefore, *ex vi termini* imports an obligatory direction by the testatrix. Judge Story, in his Commentary on Equity Jurisprudence, said, that words of recom-

mendation, and others precatory in their nature, imply a discretion, as contra-distinguished from peremptory orders; and, therefore, ought to be so construed, unless a different sense is irresistibly forced upon them.—2 Story's Eq. § 1069. That principle does not interfere with our conclusion. We do not regard the words here as being, *per se*, precatory words, or words of recommendation. The word "*will*" does not, of itself, import a prayer, request, entreaty or recommendation to another; and is, therefore, not one of those words which, Judge Story thinks, ought to be regarded as addressed to the discretion, unless a different sense is irresistibly forced upon it. In the two cases of Eels v. England, and Forbes v. Ball, *supra*, in which the word *will* occurs, it was not declared to be a precatory word; but in both cases, the trusts were maintained.

While the word "will," *per se*, has an imperative force, we do not doubt that its meaning may be controlled by the context, and that the other parts of the will might be such as to require a different understanding of it. An argument in favor of withholding from the words " wish and will," an imperative signification, is drawn from the fact, that McRee is under the clause to "*give:*" "It is my wish and will he shall give," &c. The argument would certainly be entitled to great force, if *give* were only used to designate a purely voluntary act. But the word is appropriate to describe the act of transferring the title of property, without a compensation, under a power coupled with a duty of performance. If it is by the will now before us made the duty of a first taker to transfer the property to a given person, it would involve no perversion of the word to call that act a gift. Indeed, it is a gift from the testatrix, through the agency of a trustee, not the less so than it would have been had the agency of an executor been employed. If the testatrix had said, ' I *direct* that he shall give,' no one would have doubted that *give* was simply designed to describe the act of transfer in obedience to the requisition of the will. Such language would not essentially differ from that before us, and the proper construction seems equally obvious.

Another objection made to the allowance of an obligatory meaning to "will," is, that in other clauses, in which the testatrix manifestly designs to effect a complete bequest, she has used different words—in two of the clauses, "give, bequeath, and devise." In this objection there can be no force, if we regard "*will*" as an operative word of devise. There is a rule, which seeks for a word the same signification, where it occurs more than once in the will. But there is no rule which inhibits the use of different apt words to convey the same meaning, in different parts of the will.

[2.] The argument against the conclusion that the testatrix designed to create a trust in favor of Means, which has struck us with most force, is, that the terms describing the title vested in McRee are inconsistent and irreconcilable with the words by virtue of which Means claims, if those words create a trust; and that a reconcilement may be effected, by imputing to the testatrix a design simply to make a request in favor of Means. This point is kindred to another made for the appellant. The latter point is, that an unlimited power of disposition is bestowed upon McRee, to which a trust in the contingency of his dying without issue would be repugnant, and therefore void. These two points are met by the same argument, and may be considered together; for, if the rights and powers bestowed upon McRee are not legally inconsistent with the trust claimed by Means, there is neither repugnancy nor a necessity for imputing to the words an unusual meaning.

The bequest to McRee is of all the balance of the property, to have and hold to him, "*his heirs and assigns, forever, to his use, behoof, and benefit, in fee simple.*" The bequest claimed for Means is of the same property, in the contingency of McRee dying without issue of his body. The two occur in the same clause of the will. Is the latter void on account of its repugnancy to the former? The limitation over in favor of Means, if valid, is an executory devise. It is a principle of law, too well settled to be controverted, that an absolute power of disposition or alienation in the first taker defeats a limitation over by

way of executory devise.—Flinn v. Davis, 18 Ala. 132; Weathers v. Patterson, 30 Ala. 404; Denson v. Mitchell, 26 Ala. 360; 4 Kent's Com. (m. p.) 270. This principle does not assert, that if an estate in fee is given, there can not be a subsequent limitation over by way of executory devise, notwithstanding the right of alienation and disposal is incident to every fee. If such were the effect of the principle, it would destroy altogether that class of executory devises which take effect in defeasance or abridgment of the prior estate. It is settled, that by an executory devise a fee may be limited after a fee, or a limitation may take effect in qualification, abridgment, or defeasance of the preceding estate.—4 Kent's Com. 297; 6 Green. Cruise on Real Property, 366; Marks v. Marks, 10 Mod. 419; Pells v. Brown, Cro. Jac. 590; Isbell v. Maclin, 24 Ala. 315; Fearne on Remainders, 13, 371.

In the case of Pells v. Brown, *supra,* which is the leading case upon the subject, the devise was to Thomas and his heirs forever, and, if Thomas died without issue, then over; and the limitation over was held good as an executory devise. The proposition, therefore, that the power of disposition incident to every fee defeats an executory devise limited upon it, is not maintainable; and the principle, that where there is an absolute power of disposition, the limitation over is repugnant and void, must not be understood to assert that proposition.

What is meant by the absolute power of disposition which defeats an executory devise, can best be ascertained by referring to the reason upon which the principle is founded. One of the distinguishing properties of an executory devise is its indestructibility and its total exemption from the power and control of the first taker.—Fearne on Rem. 418–419–420; 4 Kent's Com. 297. As a consequence of this characteristic of executory devises, when the testator's intention to place the limitation over under the power of disposition of the first taker appears, the executory devise is void. The absolute power of disposition, which defeats the limitation over, is, therefore, a power to destroy it by alienation, and not merely a power to alien the estate vested in the first taker. This

will be apparent by a recurrence to the authorities, which show that an absolute power of disposition makes the limitation over repugnant, only because an executory devise is indestructible; and that the doctrine of repugnancy never has been applied, except in cases where the power of disposition infringed the limitation over.

Kent's statement of the doctrine is as follows: "The executory interest is wholly exempted from the power of the first devisee or taker. If, therefore, there be an absolute power of disposition given by the will to the first taker; as if an estate be devised to A in fee, and if he dies *possessed* of the property without lawful issue, the remainder over, or remainder over of the property which he, dying without heirs, should leave, or without selling or devising the same; in all such cases, the remainder over is void as a remainder, because of the preceding fee; and it is void by way of executory devise, because the limitation is *inconsistent* with the absolute estate or power of disposition expressly given, or necessarily implied by the will. A valid executory devise can not exist under an absolute power of disposition in the first taker."

To prove that, in every case in which the limitation over has been held void for repugnancy, there was an express or implied power of disposition inconsistent with it, and infringing it, we make the following succinct statement of the point decided in several English and American cases. In Cuthbert v. Purrier, 4 Jac. (4 Cond. Eng. Ch. R.) 415, the power of alienation inconsistent with the executory devise was given, by making the intestacy of the first taker one of the contingencies upon which the limitation over was to take effect. Such is the view taken of the case in Keyes on Chattels, § 154; and it is the only manner in which it can be reconciled with the other cases. So the limitation was repugnant in Bourn v. Gibbs, 1 Russ. & M. 615, (5 Eng. Ch. 615,) because it was limited upon the contingency of not being disposed of by the first taker in her life time, or by her will. So, also, in the Attorney-General v. Hall, Fitzgibbon's R., the first taker had the power of alienation and consumption, because the limitation was of so much as he might die possessed,

and the limitation was therefore repugnant.—Keyes on Chat. § 146. The limitation over was declared void in Ross v. Ross, 1 Jac. & Walker, 154, because it was limited upon the contingency of the first taker not disposing of the property by will or otherwise. In the case of Meredith v. Heneage, 1 Sim. 543, the testator gave the property to his wife, "*unfettered and unlimited;*" that, together with some other expressions in the will, was deemed sufficient to justify the conclusion, that certain words of entreaty which followed were not designed to create a trust, and that the wife took the absolute estate. The words "unfettered and unlimited" were regarded as showing the intention that the wife should have the power of disposition of the entire estate, and thus leave nothing for the operation of a trust limited over. This case, therefore, sustains the proposition now in hand. Yet it is proper to remark in reference to it, that it does not afford a criterion for the construction of the language before us. The words "unfettered and unlimited" might well be deemed sufficient to show that no trust was created by words of entreaty which follow, and yet be insufficient to show that no trust was created by mandatory words, such as "will," in this case. So, too, those words, in connection with other expressions of the same tendency, might be sufficient to overcome any force of following words of entreaty, and to show a power of disposition qualified; and yet be insufficient to show that no trust was created by mandatory words, such as "will" in this case. "Unlimited and unfettered" were regarded as negativing the intention of the testator to limit the wife's estate by imposing trusts which it was attempted to imply from ambiguous language.

In the United States, limitations over have been held void for repugnancy, where the contingency was the death. of the first taker, "without giving, devising, and bequeathing by will, or otherwise selling or assigning the estate, or any part thereof."—Jackson v. Robbins, 16 Johns, 588, S· where the limitation was of such property as the first taker died possessed of; Jackson v. Bull, 10 Johns, 19, where the limitation was of such estate as the first taker

might leave; Ide v. Ide, 4 Mass. 500, where the first taker had an express power to dispose of the property at discretion while she lived and at her death; Newland v. Newland, 1 Jones' (N. C.) Law, 463, where there was an express provision that the property was to be at the disposal of the first taker; Ferris v. Gibson, 4 Ed. Ch. 710, where the limitation over was of all the property, if any remained; Ramsdell v. Ramsdell, 21 Maine, 288, where one of the contingencies was, if the first taker should not sell the land; Melson v. Doe, 4 Leigh, 408, where the limitation was of so much of the estate as might remain undisposed of by the first taker; Riddick v. Cohoon, 4 Randolph, 547; see, also, Williams v. Jones, 2 Swan, 620; Pushman v. Filleter, 3 Ves. 7; Davis v. Richardson, 10 Yerg. 290; Cook v. Walker, 15 Geo. 457; Hill v. Hill, 4 Barb. 427; Chrystie v. Phyfe, 22 Barb. 218; Theological Seminary v. Cole, 18 Barb. 376.

The citation of these cases, and the reasoning upon which they proceed, are abundantly sufficient to show that the *absolute* power of disposition in the first taker, to which a limitation over is repugnant, is a power to dispose of the entire estate, including the limitation, and in destruction of the limitation. Such power of disposal seems to be called absolute, in contra-distinction to the power of disposition of a defeasible fee vested in the first taker. The power of alienation, incident to the vesting of a fee in the first taker, is not inconsistent with the limitation over; for, as the limitation over may take effect in defeasance of the fee, so it may of an estate conveyed under his power of alienation. It may operate not only against the first taker himself, but also against an alienee. The bestowment of a fee upon the first taker indicates no intention of the testator to give a power to destroy the limitation over. The language vesting a fee in the first taker is reconcilable with that creating the limitation over, upon the supposition that the latter is a qualification of the former. It is true, as contended by the appellants' counsel, that words which create a fee-simple title, of themselves, import the vesting of an estate subject to no defeasance or condition; but that does not interfere with the other

doctrine, that such words may be qualified by words creating a limitation over by executory devise; for Blackstone, the appellants' authority for the effect of a fee-simple title, gives as an example of an executory devise, a devise to A. and his heirs, but if A. dies before the age of twenty-one, to B. and his heirs.

What we have already said shows that there is no repugnancy because the estate of the first taker is to him and his heirs forever in fee simple. They do nothing more than appropriately describe a title in fee simple. But the testatrix has employed other words. The estate is to him, "his heirs and *assigns* forever, *to his use, behoof and benefit,* in fee simple." *Assigns, to his use, behoof and benefit,* cannot be construed as evincing a design to clothe the first taker with the power of destroying the limitation over. Certainly those words evidence an intention that the first taker should have the use and benefit of the property and the power of alienation; but they add nothing whatever to the force of the accustomed words used in the creation of a fee-simple title. All that they import would have been implied without them. They are added here, as such words frequently are in deeds and wills, from a superabundant caution. There is no conceivable reason why a testatrix should be allowed to qualify an estate in fee simple, unaccompanied by those words, and yet be denied a similar power when they are added. Those words, as well as the accustomed words descriptive of a fee simple, all find their operation in describing the estate and the powers of the first taker, and those coming in under him if the contingency upon which the executory devise is limited does not occur.

The cases fully sustain the construction which we place upon the words *assigns, use, behoof and benefit.* In Parsons v. Baker, 18 Vesey, the devise was to the first taker, "his heirs and *assigns,* forever;" and yet the limitation over upon the contingency of his having no child or children was sustained. The decision in Pierson v. Garnett, 2 Bro. Ch. 38, where the bequest was to P. P., "his executors, administrators and assigns," was the same. The master

of the rolls said: "I think no stress can be laid on the words *executors, administrators* and *assigns*."

The decision by Chief-Justice Marshall in Smith v. Bell, 6 Peters, 68, construed a will in which the testator gave his personal estate to his wife, "to and for her own use and disposal absolutely; the remainder after her decease to be for the use of the said Jesse Goodwin." It was decided, that upon the wife's death, the property went to Jesse Goodwin. The opinion contains the following remarks, as to the qualification of the estate given to the wife: "The first part of the clause, which gives the personal estate to the wife, would undoubtedly, if standing alone, give it to her absolutely. The operation of these words, when standing alone, cannot be questioned. But suppose the testator had added the words 'during her life.' These words would have restrained those which preceded them, and have limited the use and benefit, and the absolute disposal given by the prior words, to the use and benefit, and to a disposal for the life of the wife. The words, then, are susceptible of such limitation. It may be imposed on them by other words. Even the words *disposal absolutely* may have their absolute character qualified by restraining words, connected with and explaining them to mean such absolute disposal as a tenant *for* life may make. If this would be true, provided the restraining words *for her life* had been added, why may not other equivalent words, which equally manifest the intent to restrain the estate of the wife to her life, be allowed the same operation?" This entire reasoning is obviously applicable to the point now under consideration, and is entitled to peculiar weight, because the power of disposition was given by an expression much stronger than "*assigns*." The same will seems to have been construed, with a different result, by the supreme court of Tennessee, in Smith v. Bell, Mar. & Yerg. 302, to which book we have no access; but we infer from remarks upon the case, in subsequent decisions by the same court, that the phrase "*absolute* disposal" was regarded as conveying not merely an ordinary power of disposition, but such as would include and might de-

stroy the limitation, and was, therefore, irreconcilable with it.—Richardson v. Davis, 10 Yerg. 290. While the adjective *absolute*, in that case, may have enlarged the power of disposition, we apprehend that the decision asserts no principle adverse to our argument in reference to the construction of this will, which contains no such word. Besides, the authority of the case is weakened, if not destroyed, by the conflicting decision of the supreme court of the United States, delivered by Chief-Justice Marshall.

In the case of Hill v. Hill, 4 Barb. 419, the devise was to "Thomas Hill, and to his heirs and assigns forever;" with a prohibition of sale within fifteen years unless to one of the testator's children, and with a limitation over in the contingency of death without issue at the time of his death. Notwithstanding the word "assigns," the court, after citing many cases, in which the first taker was held to have taken the absolute property, said : "In all these cases of the giving of the first taker an absolute property, there was an attempt to give to the executory devisee such part of the property as should not be sold or disposed of by the first devisee. But the case before us is of a different character. It is true it commences by giving the property to him and his heirs forever, but the expression is qualified by the subsequent limitation. The condition on which the estate is given, that Thomas shall not sell or convey it within fifteen years, does not enlarge the estate. The testator did not devise the estate to Thomas, his heirs, &c., absolutely, but on two express conditions : one, that he should not die without lawful issue, and the other, that he should not alien within fifteen years after the death of the testator, except to some one of the testator's children. The *jus disponendi* was, therefore, not *absolute*, but *conditional*. If Thomas sold to one of his brothers within the fifteen years, or to any other person after that time, the grantee, in either case, would take the land subject to the same contingency, that is, the death of Thomas without lawful issue ; and upon the happening of that contingency, such grantee would be divested of the estate." We quote thus largely from this last case,

because it seems to cover the precise point of discussion in this case.

In the case of Webb v. Wooll, 13 English L. & Eq. 63, a case relied upon by the appellants' counsel, there was a bequest to the testator's wife, her executors, administrators and assigns, to and for her and their own use and benefit, upon the fullest trust and confidence that she would dispose of the same for the joint benefit of herself and the testator's children. There was in this case no question as to a limitation, but the controversy was between the widow of the testator and his children, as to whether the right of the former was exclusive, or in trust for herself and the children; whether the gift to the wife was of a beneficial interest, or whether she took only as a trustee. In deciding this question, the words *assigns, executors and administrators*, were allowed much force in producing the conclusion, that the wife took a beneficial interest, and that the following words did not impose a trust upon her. The same effect may be allowed to the word *assigns* in this case as was allowed in that, without affecting our argument. It would simply show that the first taker had a beneficial interest in the property,—which, of course, our argument does not deny.

In Meredith v. Heneage, 1 Sim. 543, the word *assigns* also occurs, but is not noticed in the opinion at all; but the argument is drawn from the fact, that the estate of the devisee is declared to be "unlimited and unfettered," and some other expressions of the will. No such words occur in the will now before us, nor is there any equivalent expression. "Unlimited and unfettered," in connection with other things, seems to have been regarded as negativing any intention to "fetter and limit" the estate by imposing trusts upon the devisee.

We think the reasoning and authorities above adduced fully maintain our position, that there is no repugnancy, which makes the limitation over void, and that the executory devise is sustained by a construction which does no violence to the language which describes the estate of the first taker.

[3.] The second clause of the will gives a legacy to

Means, of five thousand dollars, to be paid in five equal installments. The next clause gives all the "balance" of the property to McRee. Upon these two clauses it is argued for appellants, that the legacy of five thousand dollars is so charged upon McRee's devise, that the bequest to the latter must, by implication, be enlarged into an absolute estate. The doctrine is well established, "that where a devisee, whose estate is undefined, is *directed* to pay the testator's debts or legacies, or a specific sum in gross, he takes an estate in fee, on the ground that, if he took an estate for life only, he might be damnified by the determination of his interest before reimbursement of his expenditure."—2 Jar. on Wills, (m. p.) 171, (top) 125. A distinction is drawn, between a charge upon the estate, and a charge upon the person of the devisee: the latter enlarges the estate by implication; the former does not. The distinction rests upon the satisfactory reason, that where the person of the devisee is charged in respect to the estate, there is a personal liability which may continue after his death; but it is otherwise where the charge is upon the estate. The distinction is well settled.—Collier's case, 6 Reports, 16; Jackson v. Bull, 10 Johns. 148; Jackson v. Martin, 18 Johns. 31 Spraker v. VanAlstyne, 18 Wend. 200; Olmstead v. Harvey, 1 Barb. 112. Now it is certain, that the legacy of five thousand dollars is not charged personally upon McRee in reference to the estate bequeathed to him, but is to be paid by the executors out of the general assets of the estate. The doctrine of enlargement by implication from a charge is, therefore, not available to the appellants.

[4.] It is contended, that the contingency of dying without issue of the body implies an indefinite failure of issue; and that, therefore, the executory devise is void for remoteness. We need not inquire what judgment the common law would pronounce upon that question, for we regard it as settled by the Code. Section 1302 of the Code is in the following language: "Where a *remainder* in real or personal property is limited to take effect on the death of any person without heirs, or heirs of his body, or without issue, the word *heirs*, or *issue, must* be construed

to mean heirs or issue living at the death of the person named as ancestor." Notwithstanding remainders are alone expressly mentioned, this statute must be construed to include executory devises. This statute is almost a literal copy of section 22, title 2, part 2, chap. 1, art. 1, page 724, of the New York Revised Statutes, and is evidently borrowed from it. The New York statute has only the word "*remainder ;*" yet in New York the courts have uniformly regarded it as including executory devises. Miller v. Macomb, 26 Wend. 229; Hill v. Hill, 4 Barb. 424; Ferris v. Gibson, 4 Edw. Ch. 707. It was unimportant, after the insertion of section 1301 of the Code, that the distinction between executory devises and remainders, should be observed, for it abolishes the distinction between the two.—4 Kent's Com. 272. That section gives to contingent remainders the same properties and effect as executory devises. It would be a most unreasonable construction, which would say that the distinction between executory devises and contingent remainders is broken down, and that they have the same properties and effect, and yet the same words shall have altogether a different import when the question of remoteness is to be determined. Executory devises are within all the evils to be avoided and benefits to be accomplished by the statute. They are within the spirit and intent of it; and we decide, with the New York court, that remainder was used in its ordinary, rather than in its strict legal acceptation, and that it embraces executory devises. We not only have the authority of our own observation, but the highest legal authority, for saying that "the term remainder is sometimes used in a lax sense to denote any kind of subsequent interest, or the limitation thereof."—2 Fearne on Rem. 54.

It is argued, that because some of the articles belonging to the estate were such as would be consumed in the specific use of them, there is an inconsistency between the estate of the first taker and the limitation over. Such inconsistency could only exist upon the supposition, that the articles *quæ ipso usu consumuntur* were intended to be specifically enjoyed. That intention is not manifested in

the will, nor is it deducible from it according to the principles of construction which prevail in such cases.—Harrison v. Foster, 9 Ala. 955; Keyes on Chattels, §§ 20–23, pages 17–32; 4 Kent's Com. (m. p.) 353, (top) 439–440.

The counsel have not argued in their briefs any question arising on the account ordered by the chancellor, and we therefore do not pass upon it. If it is desired that we should consider the account, our attention may be called to it by written arguments during the term. The chancellor's decree is affirmed.