## THE LOOMIS INSTITUTE *vs*. FRANK E. HEALY, ATTORNEY-GENERAL.

First Judicial District, Hartford, May Term, 1922.
WHEELER, C. J., BEACH, CURTIS, BURPEE and KEELER, JS.

The intent of a testator governs the construction of his will in all cases in which terms of art of rigid and technical meaning are not employed.

In this State a testamentary trust will not be raised by expressions of recommendation, confidence or desire, unless it clearly appears that the testator used them in an imperative or mandatory sense.

The word "will," when used by a testator, has no fixed, invariable meaning or construction; it may signify positive direction or command, or it may express a mere wish or desire, depending upon the context and upon all the attendant circumstances.

Precatory words cannot cut down or diminish an estate given absolutely in clear and decisive terms in an earlier part of the will.

There is a well-recognized distinction between an uncertainty where the intent to establish a trust is clear but the provisions are so indefinite as to render the trust void, and an uncertainty which simply indicates the want of intention to create a trust. In the former case the gift fails, in the latter case the legatee takes the property free from any limitation or restriction.

Probable difficulties and embarrassments in the administration of a fund, should the gift be held to be a trust, are considerations to be regarded in reaching a conclusion as to the intention of the testator.

No precatory words will create a trust if they apply not only to the property given by the testator but to all the property of the legatee.

Four brothers and a sister—descendants of Joseph Loomis, who settled in Windsor, Connecticut, in 1639—agreed to leave the residue of their respective properties for the purpose of founding and maintaining a school in Windsor to be called the Loomis Institute, and in furtherance of this project the legislature in 1874 granted them a charter. This provided, among other things, that the general management and control of the Institute should be vested in a board of trustees; that the education or tuition should be "free and gratuitous"; that the trustees should have power and authority to lay out and improve the school grounds, determine the number and style of the buildings to be erected thereon, and cause plans of the same to be made and lodged on file in the office of the town clerk; and that they might proceed to erect and equip such

buildings, or so many of them as they might deem expedient, whenever the funds of the Institute reached $200,000 in amount. In 1913 a plan was adopted and several of the buildings shown thereon were erected and equipped. The trustees now believe that additional dormitories are needed to meet the increasing number of applicants for admission, and seek the advice of this court as to their powers and duties respecting such enlargement of the school plant, more particularly as they may be affected by a certain clause in the will of John Mason Loomis, the last survivor of the founders, who died in August, 1900. The entire residue of his estate, amounting to $1,442,000, he left "to the Trustees of the Loomis Institute for its sole use forever." This was by far the largest contribution received from any one of the founders, the aggregate contributions of the other four reaching only $479,000. After stating at some length the motive which prompted this gift and the results anticipated from it, the will proceeds: "My Will is that no buildings shall be commenced until at least two hundred thousand dollars are in the hands of the Trustees of the Institute for that purpose. That not more than one third of the funds of the Institute, shall be at any time invested in the grounds, buildings and outfit of the Institute, the other two thirds, shall be kept invested to produce the income necessary for the support of the Institute, and when the income shall be insufficient to pay the expenses of the Institute, such expenses shall be reduced until the income is equal to their payment, and if the Institute is in need of more income, let it appeal to the Loomis Family. That under no circumstances shall any of the property of the Institute be mortgaged or pledged for any loan or thing whatever or for any purpose whatever. No debt whatever shall be created." *Held* that the clause above quoted, construed in the light of all the surrounding circumstances disclosed by the record, was not imperative and did not establish a trust, and that the plaintiff took the legacy given by the will of John Mason Loomis absolutely and without restriction. (*One judge dissenting.*)

Argued May 4th—decided November 27th, 1922.

Suit to determine the rights and obligations of the plaintiff in its use of funds received by it from the estate of John Mason Loomis, brought to and reserved by the Superior Court in Hartford County, *Hinman, J.*, upon an agreed finding of facts, for the advice of this court. *Superior Court advised that plaintiff takes the legacy absolutely and without restriction.*

The Loomis Institute, the plaintiff, was incorpo-

rated in 1874 by the General Assembly, and its charter
was amended in 1893, 1905 and 1915. The general
purposes of the Institute are set forth in said charter as
follows:

"Sec. 2. This institute shall be, and the same hereby
is, constituted and established for the free and gratui-
tous education of all persons of the age of twelve years
and upwards to twenty years in all the departments
of learning which are now taught or hereafter may be
taught in the various grades of schools in this country,
and also for the purpose of maintaining and supplying
all those whose condition and circumstances may re-
quire it, with all those things which may be deemed
necessary and proper for their comfort and advance-
ment in useful knowledge, so far as the funds of the
institute will permit. . . .  In case a greater number
of persons having the requisite qualifications shall
apply for admission than the institute can accommo-
date, then selection from said applicants shall be made,
first from those belonging to the Loomis family by
name or consanguinity, next from those belonging to
the town of Windsor, next from those belonging to the
State of Connecticut, and next from those deemed
most worthy, without regard to state or nation, all
of which shall be determined by said trustees and their
successors, or by committees by them appointed, in
conformity to the provisions of this act." 7 Special
Laws, p. 700.

Various members of the Loomis family, being four
brothers and one sister, had entered into a family com-
pact for the establishment of the Institute, namely,
James C. Loomis, Hezekiah B. Loomis, Osbert B.
Loomis, Abby Loomis Hayden and John Mason Loomis,
all of whom made the Institute residuary legatee under
their several wills. Subsequently by the will of Wil-
liam H. Loomis, who was not a party to the family

compact, the Institute received a gift of the residue of his estate, expressing in his will a "desire that, if the sum is sufficient, the same be used to construct a building to be known as *The William H. Loomis Building,* Seventh Generation, Grandson of Joseph Loomis."

James C. Loomis died September 16th, 1877; Hezekiah B. Loomis died June 19th, 1878; Osbert B. Loomis died April 30th, 1886; Abby L. Hayden died June 10th, 1898; and said John Mason Loomis died August 2d, 1900. The property received from the estate of John Mason Loomis was of the book value, when received, of $1,442,469.12. Said property was received by the plaintiff at different times commencing December 31st, 1911. The properties received from time to time from the other donors, members of said family compact, and from William H. Loomis, were respectively valued, when received, at the amounts and received in the years stated as follows:—

| Name | Date | Amount |
|---|---|---|
| James C. Loomis, April 19, 1901 and subsequently | | $207,994.55 |
| Hezekiah B. Loomis, May 27, 1901 and subsequently | | 217,626.30 |
| Abby L. Hayden, June 10, 1901 and subsequently | | 23,267.64 |
| Osbert B. Loomis, Jan. 14, 1902 and subsequently | | 30,197.50 |
| William H. Loomis   Dec. 31, 1915 and subsequently | | 313,364.00 |

A part of the real estate received from the estate of James C. Loomis and a part of the real estate received from the estate of Hezekiah B. Loomis, is used by the Institute for its school site, the aggregate value of such real estate from said two last-named estates amounting to about $6,200.

The plaintiff's trustees, in the year 1913, adopted

a plan for the school, including a number of buildings, and the development of its grounds. It is provided in the charter of the corporation that such a plan should be made and recorded in the Windsor land records, which has been done. This plan is incomplete, and power is given in the plaintiff's charter to complete this plan.

The plaintiff's trustees held and invested the property received by them from the donors above named, excepting William H. Loomis, and from time to time acquired additional land for use as a site for the school, on which it is proposed to erect school buildings and plant.

From April, 1901, when funds were first received, until September, 1914, when the Institute was opened, the income from property received amounted to about $600,000. During that time the trustees expended about $650,000 in constructing buildings, buying land, improving and developing the grounds, purchasing equipment and outfit, and for taxes and expenses of administration. Since the opening of the school, further amounts have been expended bringing the aggregate expenditure up to about $1,000,000. Included in the last-named amount is approximately $109,000 spent in constructing a refectory and charged to the fund derived from the estate of William H. Loomis. Two dormitories erected and the refectory are designed primarily for students not lodging or boarding in the village of Windsor. These last-named buildings and the laundry and power-plant yield revenue constituting a material part of the income available for the main support of the Institute. Existing accommodations are inadequate to accommodate all the students applying for admission. The trustees believe that the erection of additional dormitories, contemplated in the plan before referred to, will not

only further the corporate purposes of the institution but will yield additional revenue and be a good invest-ment without any large increase of operating expenses, and will cause but a slightly increased burden upon its endowment funds.

On the books of the corporation the grounds, build-ings and outfit were on January 1st, 1921, carried at approximately $925,000, and the invested funds at approximately $1,547,000. The accounts of the treas-urer show no substantial change on January 1st, 1922.

The will of John Mason Loomis gives all of his es-tate to three trustees named therein, in trust to pay the testator's debts and expenses of administration, and further to pay certain legacies after the death of his wife, and to pay under certain conditions an annuity of $5,000 to his sister, Abby L. Hayden, during her life; the use of the entirety of his estate is given to his wife, subject to the aforesaid annuity, and finally "to pay and turn over the entire residue of my estate, including my personal effects, watches, ornaments, decorations, arms, uniforms, horse equip-ments, carriages, harness and stable outfit to the Trustees of the Loomis Institute for its sole use for-ever." The will continues as follows: "To describe and identify the said Loomis Institute, to whom I give the entire remainder of my estate, I hereby attach to this will and make a part of it, a printed copy of the act of the Legislature of the State of Connecticut approved July 8th, 1874, incorporating the Loomis Institute in the town of Windsor in said State. I am moved to make this gift for the benefit of the whole Loomis Family, descended or to be so from Joseph Loomis, who founded the family in America in 1639, for these reasons My brothers, my sister, and myself, finding ourselves entirely without living representatives, all the children of our group of the Loomis family being

dead, joined in a compact, agreeing that each by his or her will should devote the remainders of our estates to the establishing and maintaining of an educational institute in Windsor in Hartford County, State of Connecticut, the place of our nativity, upon that tract of land, situated in said Windsor and known as 'the Island,' and upon that portion of the same, upon which Joseph Loomis of Braintree, England, the founder of the family in this country settled in 1639, and upon which he lived and died in 1658, which was the birthplace of our Father Colonel James Loomis, who lived and died in said Windsor in 1862 and which has always belonged to, and been occupied by the family from its earliest occupation by the said Joseph Loomis, to be called The Loomis Institute, and which Institute was incorporated in the year 1874 as before' stated and shown. Hoping to leave some mark for good upon our race and time, we present to the Loomis Family this their Hearth Stone, and endow it with all we have, inviting them to rally around it as their shrine, from which their boys and girls shall take the highest inspirations for better and grander lives, from the best of their race who have gone before, and like them, ever keeping the banner of human progress, honor and manhood to the front.

"My Will is that no buildings shall be commenced until at least two hundred thousand dollars are in the hands of the Trustees of the Institute for that purpose. That not more than one third of the funds of the Institute, shall be at any time invested in the grounds, buildings and outfit of the Institute, the other two thirds, shall be kept invested to produce the income necessary for the support of the Institute, and when the income shall be insufficient to pay the expenses of the institute, such expenses shall be reduced until the income is equal to their payment, and if the Insti-

tute is in need of more income, let it appeal to the Loomis Family. That under no circumstances shall any of the property of the Institute be mortgaged or pledged for any loan or thing whatever or for any purpose whatever. No debt whatever shall be created.

"My wish is that this Institute shall be kept up to and in accord with the best interests of society, and that in the admission of youths to its benefits, preference shall be given to those belonging to the Loomis family by name or consanguinity, next to those belonging to the town of Windsor, Connecticut, next to those belonging to the State of Connecticut, and next to those deemed by the Trustees most worthy, without regard to State or nation."

This will was executed November 28th, 1892, and on January 6th, 1893, a codicil thereto was executed, containing the following provision: "Second: I desire to omit from line 4 of the fourth page of my Will, the words, 'and make a part of it.' My intention in attaching to my Will the printed copy of the Act there referred to, was not to incorporate into and make a part of my Will, all the provisions of said Act, but was only to identify the beneficiary there named—the Loomis Institute, I have written into my will the substance of those provisions of said Act which I consider essential."

The original trustees of the corporation were the four Loomis brothers above mentioned, their sister Abby L. Hayden, and her husband H. Sidney Hayden.

The first section of the incorporating Act was amended by resolution approved May 18th, 1893, and the portion of the same so amended reads as follows: "They also shall have power and authority to take, by purchase, gift, grant, devise, or in any other manner and form, any and all property and estate, real, personal, and mixed, and wheresoever situated, and the

same to hold in trust for the sole and exclusive use and benefit of said institute; *provided*, that no purchase, gift, grant, devise, or other mode of transfer or conveyance, made to or for the use and benefit of said institute shall be accepted or received upon any condition or conditions inconsistent with the provisions of this act. And they also shall have power and authority to give, grant, bargain, sell, exchange, transfer, convey, or otherwise dispose of any or all of the estate and property so held by them, as they shall deem for the best interests of the institute, except as is herein expressly provided to the contrary." 11 Special Laws, p. 473.

The third section of said original Act is as follows: "The trustees above named shall have power and authority, with the consent of the owners thereof, to select such portion of the original homestead of Joseph Loomis, taken up by him in 1639, and continued in the ownership and possession of his descendants from that day to this, situated upon 'The Island,' so called, in Windsor, in the county of Hartford and state of Connecticut, and any other lands immediately contiguous thereto, not exceeding in quantity fifty acres, as they may deem necessary and proper, and they shall cause an accurate survey and map of the same to be made and lodged on file in the office of the land records of said town for safe keeping, there perpetually to remain. They shall also have power and authority to lay out, improve, and beautify said grounds, in such manner and to such an extent as they may deem necessary and proper—to determine the number, form, dimensions, materials, and style of architecture of the buildings to be erected thereon, and the location of the same on said premises, and shall cause plans of the same to be made and lodged on file in said office, there to be forever kept, and they may proceed to erect said buildings, or so many thereof as they may deem

expedient, and provide the same with suitable furniture, books, apparatus, and all such other matters and things as they may deem necessary and proper for the use of the institute, whenever the funds of the same shall equal the sum of two hundred thousand dollars.

"The location thus selected and determined upon shall thereafter become and forever be and remain the site and location of said institute, and no person or persons shall thereafter have power or authority to take, appropriate, convey, or otherwise dispose of the same, by gift, grant, bargain, sale, exchange, mortgage, or in any other manner or form to any person or persons, or for any cause or purpose whatever, but the same shall be and forever remain the location of said institute, and appropriated and used for the purposes intended by the donors and by the provisions of this Act.

"If the above-named trustees shall neglect or fail to exercise or perform any or all of the above-granted powers, during their continuance in office, then the same are hereby given and granted to their successors." 7 Special Laws, p. 701.

Section five of said charter as amended in 1893, reads as follows: "After the original buildings shall have been completed according to the plans of said trustees, and furnished as herein provided, it shall be the duty of said trustees and their successors to cause all of the available funds that may remain or may thereafter be received, to be safely invested in the same manner as required by the laws of this state for the investment of trust funds; and said fund shall be and remain a perpetual fund, and the rents, issues, and profits thereof thereafter shall be used and expended in defraying the current expenses of the institute, in the erection of new buildings, and in the purchase of books, maps, charts, apparatus, and all other matters and things

which may be deemed necessary and proper best to promote and secure the welfare and prosperity of the institute." 11 Special Laws, p. 473.

The amendment of 1893 also contains the following: "Sec. 4. These amendments shall take effect only upon the unanimous approval of the board of directors." The charter of the corporation was further amended in 1905, after the death of John Mason Loomis.

This action is brought against the Attorney-General as representing the public interest in the protection of gifts, legacies and devises intended for public or charitable purposes, under the provision of § 170 of the General Statutes.

The advice and protection of the Superior Court is sought in giving construction to the various wills involved and to the plaintiff's charter, and more particularly to that portion of the will of John Mason Loomis (hereinbefore quoted in full), in which he states his will to be that only one third of the funds of the Institute should be invested in the grounds, buildings and outfit of the Institute, and the remaining two thirds should be invested in productive funds.

The questions of law upon which the advice of this court is sought are as follows: (a) Whether said provision in the will of John Mason Loomis is mandatory, or whether it is merely an expression of a wish on the testator's part. (b) Whether said provision of the will of John Mason Loomis should be literally construed as an absolute restriction upon the power of the trustees. (c) Whether the trustees have power in their discretion and in the exercise of good faith, acting as they deem for the best interests of the plaintiff, to depart from the terms of said provision in said will of John Mason Loomis. (d) Whether said provision, if to any extent mandatory, is a valid and subsisting and continuous restriction, and whether it

applies to the entire funds of the Institute or merely to such part of them as may have been received from John Mason Loomis; and if it applies merely to such part of them as may have been received from John Mason Loomis, whether in that event all funds received from sources other than the estate of John Mason Loomis, and also one third of the funds received from John Mason Loomis, may be invested in grounds, buildings and outfit, without violating said provision in the will of John Mason Loomis. (e) Whether if said provision is to any extent mandatory, the trustees in computing the amount invested in grounds, buildings and outfit, shall carry such investment at its original cost or at its original cost less depreciation, or at fair present value of the same. (f) Whether if said provision is to any extent mandatory, the trustees in computing the amount of the funds of the Institute shall compute the same at their original value as entered on the books of the treasurer of the Institute, or at fair market value, or at amortized value from time/ to time. (g) Whether said provision in the will of John Mason Loomis does not conflict with the terms of the plaintiff's charter, and for that reason become inoperative. (h) Whether or not in determining how much has been invested in grounds, buildings and outfit, the cost of the building provided for out of the William H. Loomis estate shall be included. (i) Whether or not the funds received from the estate of William H. Loomis are subject to the restrictions contained in the will of John Mason Loomis.

Further facts appear in the opinion.

*Lucius F. Robinson* and *Francis W. Cole*, for the plaintiff.

*William H. Leete*, with whom, on the brief, was *Frank E. Healy*, Attorney-General, for the defendant.

KEELER, J. The brief of the defendant very correctly states that only two questions of importance are presented for the determination of the court, that is, whether the testamentary provision of the will of John Mason Loomis quoted in the statement of facts is mandatory, and does it apply to all of the funds of the Institute; which may be summed up in the one question, what is the intent and meaning of this provision? The intent of any testator governs as respects such questions as are involved in the present controversy, as in all cases where the language used does not contain terms of art which have received such a rigid application that the testator is presumed to have used them in their artificial and technical meaning. Such terms of art are commanding and their effect invariable. But when words are employed not carrying with them a decisive technical import, the principle of testamentary intent becomes the guiding rule. At one time the use of words of request, entreaty or recommendation, were held to create a trust, if the subject and object of any given provision were reasonably certain. The course of decisions in such cases well might have hardened into an arbitrary rule of construction. In *Hess* v. *Singler*, 114 Mass. 56, 59, the court, referring to the earlier doctrine, says: "But by the later cases, in this, as in all other questions of the interpretation of wills, the intention of the testator, as gathered from the whole will, controls the court; in order to create a trust, it must appear that the words were intended by the testator to be imperative; and when property is given absolutely and without restriction, a trust is not to be lightly imposed, upon mere words of recommendation and confidence." The following rule as formulated in 40 Cyc. 1735, seems to be a fair deduction from many cases, and is succinct and comprehensive: "The more modern rule, however, is that, in order that

a trust may arise from the use of precatory words, the court must be satisfied, from the words themselves, taken in connection with all the other terms of the disposition, that the testator's intention to create a trust was as full, complete, settled, and sure as though he had given the property to hold upon a trust declared in the ordinary manner." To the same effect are the following: 2 Alexander, Commentaries on Wills, §§ 1098, 1099, 1102; 1 Jarman on Wills (6th Ed. Bigelow) s. pp. 358, 359, 361 and note 1; 1 Perry on Trusts & Trustees (6th Ed.) § 113; 3 Pomeroy, Equity Jurisprudence (4th Ed.) § 1016; Gardner on Wills (2d Ed.) p. 478. In *Hughes* v. *Fitzgerald,* 78 Conn. 4, 7, 60 Atl. 694, this doctrine is recognized and stated as follows: It is "settled law in this State, that a trust will not be raised by expressions in a will importing recommendation, confidence, or desire, unless it clearly appears that they were intended to be used in an imperative sense," citing *Bristol* v. *Austin,* 40 Conn. 438, 447; *Harper* v. *Phelps,* 21 Conn. 257, 269; *Gilbert* v. *Chapin,* 19 Conn. 342, 351.

An important corollary to this rule is that precatory words cannot cut down or diminish an estate given absolutely in the foregoing portion of the will. 2 Alexander, Commentaries on Wills, § 1100. "Where an estate in fee is devised in one clause of a will, in clear and decisive terms, it cannot be taken away or cut down, by raising a doubt upon a subsequent clause, nor by inference therefrom, nor by any subsequent words that are not as clear and decisive as the words of the clause giving the estate in fee." *Ross* v. *Ross,* 135 Ind. 367, 371, 35 N. E. 9.

Bearing in mind the above general rules, but at the outset leaving out of view certain subordinate rules for later consideration, an effort may now be made to ascertain the intent of the testator by reference to the

general structure of the will and the language used to express his testamentary intent. He starts out with a bequest in trust of all of his property to his wife for life, coupled in certain contingencies with an annuity to his sister, Abby L. Hayden, and then, in the last direction to his trustees, directs them to pay and turn over to the trustees of the Loomis Institute the entire residue of his estate "for its sole use forever." Then follows two pages and a part of a third, of the will as originally written, containing certain explanations of testator's motive prompting his gift and giving his views as to the proper management of the Institute. At the very outset of this explanatory portion of the will he again says that to the Loomis Institute "I give the entire remainder of my estate." The entire legal title is vested in the legatee and the beneficial interest. Further " to describe and identify" the object of his bounty, he attaches to and makes part of his will a printed copy of the Act of incorporation of the Institute as passed by the General Assembly in 1874. In the first codicil of his will, made a few months after the execution of the latter, he says: "I desire to omit from line 4 of the fourth page of my will, the words, 'and make a part of it,'" and states that his intention in attaching the copy of the charter was not to incorporate the same into his will and make it a part thereof, but was only to identify the beneficiary, and adds: "I have written into my will the substance of those provisions of said Act which I consider essential." It will be noted, and will be discussed hereafter more at length, that all of the more specific matters which he had written into his will were also contained in the original charter of the corporation, excepting only the provision as to the division of its funds in investments of buildings, outfit, etc., and productive securities, and hence it is a fair deduction that the

part of his will which we are now considering was in the nature of comment and advice with regard to the objects of the institution and its management. The excision of the charter as an integral part of the will could only have been made, as appears from the language used, with a design to avoid any implication of fettering or limiting the future development of the corporation upon such lines as experience might indicate as wise and desirable. He sketches the history of the foundation of the institution and the motives which actuated his brothers, sister and himself, all finding themselves without living representatives, to devote the remainders of their several estates to the foundation of an institution which should carry down to posterity the memory of the Loomis family, to be located upon a tract of land which had been in possession of the family since its founder had settled thereon in 1639. Then, in rather grandiose style, he expatiates upon the good which he thinks will enure from this benefaction to the Loomis family, and the opportunity offered to succeeding generations thereof, catching their inspiration from the best of their race who have gone before, to keep "the banner of human progress, honor and manhood to the front."

It would seem obvious that the testator had in mind, as there were no descendants of himself and his brothers and sister, to benefit all who should bear the name of Loomis, without regard to those relatives who might be his legal representatives in case of intestacy. It was the whole family that was the object of his benefaction, and if it chanced that the family at large should prove as infertile as his immediate branch of it had evidently been, then to those belonging to the town of Windsor, and if these latter failed to make up the complement, to those belonging in Connecticut, and failing enough of all of these classes to exhaust the

resources of the foundation, then to worthy persons without regard to State or nation. The testator, in a clause just preceding the mention of the order of preference in admission of pupils to the Institute, says it is his wish that the latter should be kept up to and in accordance with the best interests of society, continuing the rather hortatory tone which appears in his preceding statement as to the motives leading him and his brothers and sister in founding the charity. It may here be noted that the provision as to order of precedence in admission of pupils to the school is a close paraphrase of the charter provision in that regard.

Passing now to the paragraph which gives rise to the present action, we may note that the testator says it is his will that no buildings shall be commenced until at least $200,000 are in the hands of the trustees. This is identical with the charter provision. He also says that none of the property shall be mortgaged or pledged. The charter provision is to the same effect. There is also in this paragraph the direction that when the income of the institution shall be insufficient to pay expenses, the same shall be reduced in proportion, "and if the Institute is in need of more income, let it appeal to the Loomis Family. . . . No debt whatever shall be incurred." The provision just mentioned is, of course, only hortatory, and in effect advice to conduct the affairs of the school on a cash basis. It contains no implication of a trust. What remains of the paragraph under discussion is this provision: "That not more than one third of the funds of the Institute, shall be at any time invested in the grounds, buildings and outfit of the Institute, the other two thirds, shall be kept invested to produce the income necessary for the support of the Institute." The defendant claims that the words just quoted constitute an imperative trust, and cut down the absolute estate given to the plaintiff.

in a prior paragraph of the will, to the extent and in the way indicated by the words used; and further, that said words apply to and control the disposition and management of the entire property of the corporation.

From a reading of the will and codicils of John Mason Loomis in connection with the charter of the corporation, it is very evident that the founding of the Loomis Institute and its subsequent operation was a matter very near to the testator's heart. He had agreed with his brothers and sister that all of them should devote the residue of their several estates for that object. All of them were created trustees of the corporation by its original charter. All of them had made wills in which the Institute had been constituted residuary legatee, without trust or condition except that in one instance there was a testamentary condition that the corporation should keep in good order the family burying-ground. Before his death at least, and presumably much before, he was familiar with the provisions of the wills of these relatives, as he took beneficially under all of them, and all of them predeceased him, and his three brothers had all died before John Mason Loomis executed his will. His sister died in 1898. In the year 1893, just after the testator executed his will and first codicil, an amendment of the charter was procured, presumably upon the initiative of the then trustees of the corporation of which he was a trustee. At the time he made his will he and his sister were the only survivors of the original Loomis trustees. In a way he stood as the leading representative of the family at the time he executed his will, and a successful career for the Institute in the future must have been much in his mind. His nearest relatives were evidently cousins, and to some of them if not to all he gives legacies, not large considering the amount of his estate.

There is no reason to suppose that he had these persons, and any others who might answer to the description of legal representatives in case of intestacy, particularly in mind as possible objects to his bounty. If his real desire was to raise a trust with respect to the proportion of funds to be devoted to buildings and outfit on the one hand, and to productive investment on the other hand, he must have known that should this trust never become effective, either because the corporation could not legally accept the gift or trust, or in its discretion did not deem it wise by acceptance to fetter its future action in the management of the Institute, then the bulk of his large estate would go to these cousins and perhaps other representatives. If he did know this, it is hardly to be believed that he would try to effectuate his restrictive intent by words mingled with other clauses purely advisory and hortatory. His desire that the Institute should not fail to receive all his property, is evinced by a provision in the first codicil to the effect that if there should be any danger of failure or lapse of the portion of his estate given to the Institute by reason of its incapacity to take real estate, then the Institute should take no interest therein, but that his realty should be sold and the proceeds of sale paid over to the corporation. This second codicil was evidently made for the purpose of picking up loose stitches and of rendering the provisions of his will entirely clear. The testator lived seven years after the making of the first codicil in 1893, and in 1899 made another codicil in which he modified a power given in his will to his wife to use a part of the principal of his estate. All of the testator's brothers had died before the making of his will and codicils, and he knew that they had each given the residue of their estates to the Institute unreservedly (except as to the trifling exception above noted) and without hamper of trust

or condition.   He himself states in his will that the
Loomis brothers and sister had made a family compact
to devote the bulk of their several estates to the founda-
tion of this institution, so that it would appear that
he did not intend seriously to modify the plan agreed
on and subject not only his own property, but perhaps
that given by the others, to restrictions not in the
purview of the original family compact nor in accord-
ance with the broad and liberal provisions of the char-
ter which they had all united in procuring.   Taking
all of the wills and the charter into consideration, it
seems altogether probable that John Mason Loomis
intended no variation from the scheme which in the
wills of the other members of the family produced un-
restricted gifts in fee, that he understood and respected
the views of those who had predeceased him, and that
any variation from the tenor of the other family wills
evinced no intention to place any restriction upon
the gift, absolute in form, contained in his will.   He was
a man of large means and evidently considered his
opinion upon any question of management of property
as valuable, and did not hesitate in offering liberal
advice to the management of the Institute.   Except
for the words giving rise to the controversy in the pres-
ent case, everything in the part of the will quoted in
the statement of facts as above set forth, is in the
nature of explanation of motive, or of emphasis on
provisions already existing in the charter.   All of the
clause in which occur these words whose meaning is in
question in the instant case, follows the initial words,
"My Will is."   The testator "willed" in that clause as
to some things already contained in the charter, added
some wholesome observations about keeping out of
debt, recommended further appeal to the Loomis
family for funds if more were needed, and spoke of the
ratio between the cost of land and outfit and the amount

of productive investments. All of this is in one para-
graph, and all is comprehended in the designation by
the testator as to what his will was. He did not need
to have any "will" as to matters contained in the
charter, nor in recommending a pay-as-you-go adminis-
tration of the corporation's finances. The fair con-
clusion would seem to be, that the use of the word
"will" had no deeper or more formal significance as
to the controverted words, than as to those regarding
other matters touched on in the paragraph. We think
the most reasonable interpretation to be that here, as
elsewhere, in the portion of the will now under con-
sideration, the testator is calling attention to what he
deems the most essential features of the charter,
commenting thereon, and making recommendations
of an advisory, but not imperative character. It is
of this part of the will which he speaks in the codicil,
and the matters included therein are designated by
him as essential. Supposing he had prefaced all his
explanatory and hortatory matter which we have just
been considering, including the clause in controversy,
with the words "I deem it essential,"—could it be
seriously contended that any trust was raised or in-
tended as to any of the matters of which he speaks?
The word "essential" carries with it no connotation
of restriction or of an imperative trust: it is at the
most indicative of an emphatic recommendation.

Having thus far laid out of view all consideration of
the words used by the testator as having any technical
sense, and arrived at the conclusion that no imperative
trust has been created by the precatory expressions of
the testator, we have now to conclude whether any of
the rules of construction compel a modification of the
result just stated. We placed at the beginning of our
review of the wording of the will, a statement that the
intent of any testator in the use of precatory words

in order to raise a trust must appear to be as complete, settled and sure, as though a trust were declared by use of the ordinary and artificial words ordinarily used to effectuate such a purpose; and also stated a further rule that a gift in fee simple clearly and decisively made in one clause of a will cannot be cut down by subsequent words less clear and decisive of later occurrence in the instrument. It seems clear that our conclusion just stated legitimately follows from the application of the rules which we have before stated and now recall. It remains to be considered whether the application of any other recognized canons of interpretation subsidiary and less important, but still frequently of value, would lead to any modification of the result at which we have thus far arrived.

It is the claim of the defendant that the word "will" used in the clause under consideration, is capable of but one significance: that it is a term of art and its use always contemplates an absolute direction. A vast number of cases could be collected in which the words "will," "wish," "desire," and other words, have been held to create trusts, and probably as many where this result has not occurred. These words have no invariable construction. To cite and then attempt to distinguish these cases would in no way be helpful. In general, each will must stand by itself, and we have held that precedents are entitled to but little weight in the construction of wills, where the cases are not precisely analogous. *Lyon* v. *Acker*, 33 Conn. 222. "The mode of dealing with one man's blunder is no guide as to the mode of dealing with another man's blunder." Gray, The Nature and Sources of the Law, § 701. Cases may be cited in abundance as to the construction of such words as "will," "wish," "desire," and others, as either precatory or imperative. It is claimed by the defendant that the word "will" carries

with its use an invariably imperative meaning by consensus of authority. Some countenance is given to this claim by a recent text-writer (2 Alexander, Commentaries on Wills, § 1103), who lays down the doctrine that the word "will" in testamentary instruments has universally received a mandatory signification. None of the cases cited by the author bears out this statement. In only one (*McRee's Admrs.* v. *Means,* 34 Ala. 349, 367) was the point directly made, and the opinion contains this qualification: "While the word 'will,' *per se,* has an imperative force, we do not doubt [but] that its meaning may be controlled by the context, and that other parts of the will might be such as to require a different understanding of it." We fail to find any authorities, other than those just referred to, which can be in any way claimed to hold the word "will" to be in all cases imperative. The following take a contrary view, and in each of them the word "will" is held to be merely precatory: *Hume* v. *McHaffie,* 40 Ind. App. 703, 81 N. E. 117; *Lines* v. *Darden,* 5 Fla. 51, 71, 73; *Pratt* v. *Trustees of Sheppard and Enoch Pratt Hospital,* 88 Md. 610, 42 Atl. 51. The case last cited not only holds as above stated, but the opinion is an exhaustive exposition of the law of precatory trusts as applied to gifts to a charitable corporation. The facts in the case raised the question of attempted control of corporate expenditures by provisions following an absolute gift, and the question presented for solution was quite similar to that existing in the case before us.

The plaintiff claims that there attaches to the provision under discussion such uncertainty as precludes the conclusion that an imperative trust is established. The well-recognized distinction between an uncertainty where the intent to establish a trust is clear but the provisions are so indefinite as to render the trust void

for uncertainty, and the uncertainty which simply indicates the want of intention to create a trust, should be borne in mind. In the former case the gift fails, in the latter case the legatee takes the property given for his own use free from any restriction. There is no claim by either party in the present controversy that a trust has been created in the will of John Mason Loomis which is void for uncertainty, but the plaintiff claims that the will shows no intention to create any trust, while the defendant claims that a definite, valid and workable trust has been created, not affected by any uncertainty. The modern law upon the subject is stated in Perry on Trusts & Trustees (Vol. 1, 6th Ed.) § 116, as follows: "Nor will a trust be implied if there is uncertainty as to the property to be subjected to the trust, or as to the persons to be benefited by the trust, or as to the manner in which the property is to be applied." This enunciation of doctrine is abundantly fortified by the authorities cited, and represents the modern English as well as American law. The doctrine is substantially that recognized in *Gilbert* v. *Chapin*, 19 Conn. 342, and the other Connecticut cases cited heretofore.

The plaintiff claims that there is such an uncertainty both as to the property referred to in the will of John Mason Loomis as "the funds of the Institute," and also as to the manner of administration, the way in which the property is to be applied, as to negative any idea of an intent to create an imperative trust. We think that the words used by the testator do apply with certainty to all of the funds of the plaintiff corporation, a fact fraught with consequences which we shall consider later. On the other hand, we believe that the second claim of the plaintiff in respect to uncertainty touching the application and administration is well founded. In the case of *In re Diggles, Greg-*

*ory* v. *Edmondson*, L. R. 39 Ch. Div. 253, 257, Bowen, L. J., said: "Just as uncertainty of the property and object are reasons for not construing the will as creating a trust, so also the fact that a trust would cause embarrassment and difficulty is a reason for coming to the same conclusion." Such a conclusion, of course, is based upon the assumption that a testator had such probable difficulty in mind, and therefore could not have intended to make his provision other than one of general recommendation and advice, and to leave freedom of action to the trustees in case any contingency should justify a departure from what the testator deemed a good general rule. It is at once evident that if this provision were mandatory and a valid trust had been created, and if the ratio laid down by the testator had been approximately reached, questions would constantly arise such as these: would the value of the buildings, etc., be their cost, their replacement value, or a value arising after deductions for depreciation, or a final writing-off of any buildings which were no longer fitted for economical use, or perhaps had been torn down? Or would the value of securities be their cost, their market value at any given time, or their book value in case a rule of amortization had been carried out? Constant difficulty of administration and application is suggested here, and it is a fair supposition that this fact was appreciated by the testator, and that he never intended a mandatory provision, or supposed that his will created an imperative trust, strict obedience to which could be enforced by appropriate legal procedure. It hardly seems probable that he did not have in mind the possibility of some future gift of realty or of money to be used for the special purpose of erecting buildings, perhaps at some future time much needed. In such a contingency if the testator's views as expressed in the will constitute an imperative

trust, it might prevent the acceptance of a gift of money for building purposes highly advantageous to the institution. Since the death of John Mason Loomis, a gift has been specifically made to the corporation for the purpose of erecting buildings, by the will of William H. Loomis, of more than $300,000. If the will created an imperative trust, it became incumbent upon the trustees forthwith to raise twice the amount of this legacy, by application (as the testator suggests) to the Loomis family or some other bountiful source of supply, or else to decline a gift which, by the provisions of its charter, the corporation may legally receive.

A perusal of the extracts from the charter of the corporation given in the statement of facts, shows, on the one hand, that the trustees are directed to adopt a definite plan for buildings and development of land, looking considerably into the future, and, on the other hand, that a distinctly liberal discretion is given the trustees in the formulation and execution of such a plan. Section 5 of the charter as amended, provides that after the original buildings have been completed and furnished according to the plans above referred to, then the trustees are to invest the remaining available funds to remain a perpetual fund and to use the income therefrom in defraying current expenses and purchase of equipment, and also in the erection of new buildings. Keeping in mind that by the terms of the charter, buildings can be erected when the sum of $200,000 is available for use, and placing this fact alongside the provision of the will relating to the ratio of building cost to available funds, we may readily see that a very vexatious limitation is placed upon the trustees, and one very probably not contemplated by the charter. When the amount of funds in hand reached the sum of $200,000 they might build and

equip a building or buildings, lay out the grounds and undertake other needed developments, but only to the extent of less than $67,000, notwithstanding further funds were in sight and sure to be received at a not distant time. It is difficult to believe that the testator contemplated such a situation, or intended to create it by the words he used.

There is another well-recognized rule of construction, to the effect that no precatory words will create a trust if such "words apply not only to the property given by the testator but to all of the property of the legatee." Theobald on Wills (7th Ed. Canadian) 490. In *Lechmere* v. *Lavie*, 2 Myl. & K. 197, the testatrix gave by her will property to two unmarried daughters, and if they married divided the gift among all her children, and in a codicil added the provision that if the daughters died single, "of course they will leave what they have amongst their brothers and sisters, or their children." The court held that no obligation or trust was created by these words, as they applied not only to the property bequeathed but to all property possessed by her daughters at their death, from whatever source derived. Similar testamentary provisions were made in *Eade* v. *Eade*, 5 Maddock's Ch. 118, and *Parnall* v. *Parnall*, L. R. 9 Ch. Div. 96, and in each case the court held that no trust was created. The cases above cited are quoted with approval in numerous American cases. It would seem that if one wishes to not only restrict by way of trust the disposition of any bequest he may make, but also to affect in a like way other property, he cannot do so by precatory words, however emphatic. Apparently such a disposition can only be made by a trust expressly set up and covering specifically the object intended by a testator, or by a gift upon condition subsequent.

As a result of the above discussion we conclude that

the provision in the will of John Mason Loomis, as to the construction of which advice has been sought, is simply precatory and does not establish a trust, and that the plaintiff takes the legacy given in his will absolutely and without restriction.

The answer to question (a) of the reservation is that the provision in question is not mandatory, but merely the expression of a wish. Question (b) is answered "No." Question (c) is answered "Yes." These answers make any answers to the remaining questions unnecessary. The Superior Court is so advised.

Both plaintiff and defendant in this action have in brief and argument discussed the question as to whether the provision under examination may not be considered as a legacy upon condition subsequent. If it should be held that the provision should be so construed, there would be, in the first place, a question of fact as to its breach, and if the condition had been broken, a forfeiture in favor of the heirs at law and next of kin of the testator. Our advice on this point has not been asked by any of the questions propounded, and furthermore this point cannot be conclusively answered, except as arising in an action to which the legal representatives of the testator are parties.

In this opinion BEACH, CURTIS and BURPEE, Js., concurred.

WHEELER, C. J. (dissenting). John Mason Loomis, pursuant to a family compact, gave by will to the Loomis Institute property valued at nearly a million and a half of dollars, about two thirds of the entire sum of the bequests which have been made to this Institute. The family procured, in 1874, from the General Assembly an Act of incorporation for this Institute, which provided that it should furnish free and gratuitous instruction to all its students. This

Act and the will of John Mason Loomis disclose the common purpose of these donors to found an institution which should be enduring, and forever carry on the great cause it should serve, and at the same time to honor and perpetuate the Loomis family, "descended or to be descended from Joseph Loomis." To this end the testator provided, in the part of the third clause which is in question, that the property of the Institute should never be mortgaged or pledged, that the Institute should not run in debt, and that not more than one third of the funds of the Institute should be devoted to the grounds, buildings and outfit, while the other two thirds should be invested and the income only used for the support of the Institute. My brethren hold that the words of this clause are mere words of advice and comment, and in consequence the invested funds of this institution, about a million and a half,—thus far set apart by the trustees in their belief that the language of this clause was imperative and must be carried out by them,—may be expended by the trustees at their discretion and without regard to these perpetuity requirements.

I differ with that construction. I think these provisions are imperative, and that the clear intention of the testator should be carried out. Further, I am of the opinion that this noble charity, so splendidly conceived by this family, will, in the long run, be injured by giving to these trustees and their successors the power to convert at their discretion this endowment into buildings and equipment. It is also my belief that the diversion of these charitable funds from the purposes designed by the testator will injure not alone this institution but all institutions of learning which live in greater part upon the bounty of the dead. I state in part the grounds of my dissent. The provisions of this will which are before us for construc-

tion appear in the statement of facts beginning: "My Will is that no buildings," etc. In their primary sense these words are precatory words, and are properly held to be words of advice unless the testator intended them to be used in another sense. We determine this by reading them in connection with the other parts of the will and in the light of the circumstances sur-. rounding the testator at its making. Whether the language of this clause creates a trust as the defendant claims, or is merely an expression of the testator's advice, depends upon the intention of the testator in its use. All the law involved in this question is summed up, and in conformity with modern authority, in *Hughes* v. *Fitzgerald*, 78 Conn. 4, 7, 60 Atl. 694, where the court, speaking by Mr. JUSTICE HALL, says: "Whether a trust has been created becomes, therefore, often a question of intention 'to be gathered . . . from the general purpose and scope of the instrument.' *Colton* v. *Colton*, 127 U. S. 300, 310, 311, 8 Sup. Ct. 1164. In determining from particular words and terms of a will whether a certain gift was intended to be made in trust, there are, however, some well-established rules which should be considered, and among those applicable. to the present case is the settled law in this State, that a trust will not be raised by expressions in a will importing recommendation, confidence, or desire, unless it clearly appears that they were intended to be used in an imperative sense . . . ; although words which are precatory in form may sometimes be regarded as mandatory in effect, where it appears that they were intended to be used in that sense." We thus adopted the rule as stated in Pomeroy's Equity Juris. (3d Ed. Vol. 3) § 1016: The testator's intent must be as "full, complete, settled, and sure as though he had given the property to hold upon a trust declared in express terms in the ordinary manner." "The question in every

case is whether they [the words] express merely the testator's wish, or whether they express his will." Gardner on Wills (2d Ed.) p. 479. Whether a trust was created by the language of this clause depends upon whether the testator meant by it to govern the conduct of the trustees, or to merely suggest by way of advice to the trustees the course of conduct they should take. That is, is the language imperative and mandatory, or is it merely precatory and advisory? There are no rules of construction which will solve this problem.

Before ascertaining the intention of the testator, let us consider the rules of construction which my brethren rely on in support of their position. The fact that this testator gave to the trustees of the Loomis Institute his residuary estate absolutely, and thereafter inserted this precatory clause, does not solve the problem. The rule is not automatic; at most this fact is a circumstance to be considered, but not a controlling one in arriving at the testator's intention. A prior absolute devise does not create a presumption that no trust was intended. The true rule is that stated in *Hughes* v. *Fitzgerald*, 78 Conn. 4, 60 Atl. 694, that the trust will not be raised unless it clearly appears that the words were used in an imperative sense. My brethren also invoke the rule—"nor will a trust be implied if there is uncertainty as to . . . the manner in which the property is to be applied." Perry on Trusts & Trustees (6th Ed. Vol. 1) § 116. Uncertainty, it is said, will arise in the administration and application of this fund if a trust be held to be created; that is, as to whether the value of the buildings and equipment would be cost, replacement value, or value arising after deduction for depreciation, or a sum less the value of buildings, etc., no longer fit for use, and as to whether the value of the securities would be their

cost, market value, or their book value in case a rule of amortization had been carried out. The difficulties under this head will vanish if approached having in mind what we said concerning a related trust. "The trust undertaken to be created is a charitable one, since its object is the education of youth. . . . Having a charitable purpose, the language used by the testator in his attempt to establish the trust and define its terms and conditions, should have such liberal and favorable construction as may be necessary to establish its validity and ascertain its meaning." *Hoyt* v. *Bliss*, 93 Conn. 344, 350, 105 Atl. 699. To hold that a charitable trust of this character failed for uncertainty in the administration and application, would be a sad reflection upon a court of equity charged with the duty of carrying out the testator's intention. There is no real difficulty in determining these questions of administration and application. They are the everyday problems of business. Two difficulties are suggested if this provision is construed to be an imperative trust. The Institute, it is said, would be forbidden to accept a gift or devise of real property unless it had on hand enough surplus investments to cover twice the value of the gift. Applied to the William H. Loomis bequest the trustees must, if an imperative trust has been created by this clause, raise twice the amount of the bequest or decline the gift. This reduces the argument to an insensible point. There is nothing in the charter or in this will to prevent the acceptance of a specific devise or bequest of building or equipment. The trustees would be thus much relieved of the need of accumulating the income for such purposes. The testator referred in the clause in question to funds acquired for the general purposes of the Institute, not those given for a specific object. It hardly seems that argument was needed to refute a contrary conclusion.

Then it is said, the testator could not have intended to give authority to begin buildings when the funds had reached $200,000 and then to restrict the expenditure for buildings, etc., to only $67,000 of the $200,000. The language plainly says this very thing. From the beginning the trustees have acted in conformity to this construction. They waited until the funds were $600,000 before, in 1914, they began the buildings. And it must be remembered that all of this family were, from 1874 to their death, trustees of the Institute, and that John Mason Loomis, the last of this family group, so continued until his death on August 2d, 1900. As he executed his will in 1892, it is a reasonable presumption that his fellow-trustees knew his purposes and in their course of conduct acted in the light of this knowledge. The rule invoked, that no precatory words will create a trust if such "words apply not only to the property given by the testator but to all of the property of the legatee," has no application to the situation before us. The testator had the right to so condition his gift, and if his intention so to do be found in the manner in which a trust created by precatory words can be found under our rule, his intention must be made effective. The statement at the conclusion of the majority opinion, that no trust can be created by precatory words if it affects other property than the testator's, is in direct conflict, as it seems to me, with our law as stated in *Hughes* v. *Fitzgerald,* 78 Conn. 4, 60 Atl. 694. The intention of the testator is the determining factor. No rule of construction can automatically determine that, as we have already said; at most, rules are only helps to aid in ascertaining this intention. The language of the will indicates that the testator used the expression "My Will is," in the clause in question, in an imperative sense. "My Will is," introducing this clause, may, so far as the word "will"

goes, have been used in a precatory or a mandatory sense. But its use in other parts of the will and codicil, and always in an imperative sense, strongly signifies that the testator used the word in the clause we are construing in a like sense. Thus immediately following this clause we find the clause: "My wish is. . . . that in the admission of youths to its benefits, preference shall be given to those belonging to the Loomis family by name or consanguinity, next to those belonging to the town of Windsor, Connecticut, next to those belonging to the State of Connecticut, and next to those deemed by the Trustees most worthy, without regard to State or nation." Carrying out a primary purpose of the will, as this clause does, it is not and cannot be claimed that its provisions were not intended by the testator to be imperative, and that it is just a bit of advice to the trustees which they may disregard or follow at their discretion. Again, in the seventh clause, we find: "But it is my Will that if the income of my Estate shall in any year fall below the sum of Fifteen Thousand Dollars, neither my Executors or my Trustees shall be entitled to any compensation for their services as such, rendered during that year, or during any subsequent year in which said income shall be less than the amount above stated, and in such event my wife shall have full liberty to use and consume any part or all of the principal of my estate for her maintenance and support without accountability to any person whoever." These manifestly are mandatory provisions, and the words "But it is my will" were used by the testator in an imperative sense. Similarly we find the expression "But it is my will" in the Third clause, 3 (b), introducing a mandatory provision as to his wife's income. In the codicil we find this clause: "Third: It is my Will, that if at any time after my death there shall be any danger

whatever of any portion of my devise and bequest to
the Loomis Institute lapsing or failing because of any
real or supposed incapacity on the part of said Institute
to receive and hold any real estate at that time belong-
ing to my Trust estate, then it shall be the duty of my
Trustees to convert said real estate into personal prop-
erty as soon as it conveniently may be; and I desire
it distinctly understood, that as to any real estate
at any time after my death belonging to my estate,
which the Loomis Institute may by any possibility
be unable under the law, to take, it is my Will that said
Loomis Institute shall not in any event have any claim
whatever upon such real estate, but shall, at the most,
be entitled to receive only the proceeds thereof in
personal property." Twice, in a clause whose pro-
visions are undeniably mandatory, we find the testator
uses the expression "It is my Will." The will appears
to have been the composition of the testator, while the
codicil is that of the skilled draughtsman, but each
makes use of the term "will" to express the testator's
intention. The other members to the family compact
predeceased this testator and he undoubtedly was
familiar with their wills. It is significant that the
will of James C. Loomis makes use of the expressions
"And my will further is," also, "And my desire is."
The testator was an executor of the will of James C.
Loomis, who was an eminent lawyer of this State, and
it is not unreasonable to assume that he made use of
this will when he drafted his own will. In the wills
of two other members of this family compact, he found
similar expressions. In *Allen's Appeal,* 69 Conn. 702,
707, 38 Atl. 701, we said: "The rule of construction
that words occurring more than once in a will shall be
presumed to be used always in the same sense, unless
a contrary intention appears by the context or they be
applied to a different subject, applies with double force

where the word in question is found in two sentences in immediate succession." While in *Greene* v. *Huntington*, 73 Conn. 106, 113, 46 Atl. 883, we said that the term "legal representatives" prima facie should receive the same interpretation when repeated in the codicil. This is Jarman's 18th Rule. See also *Ryder* v. *Lyon*, 85 Conn. 245, 251, 82 Atl. 573; *Pease* v. *Cornell*, 84 Conn. 391, 400, 80 Atl. 86, and cases cited; 2 Jarman on Wills, pp. 840–843 (5th Amer. Ed., Vol. 3, pp. 702, 709). Moreover the entire language of this will is that of command. The testator was not advising his trustees, he was directing their conduct. In ascertaining the testator's intention we should keep before us his own and the family purpose, and construe his words so as to effectuate his intention. That purpose was to found a school where instruction should be free, where first those of the Loomis name or consanguinity, next those from Windsor, next those from Connecticut, and next those found by the trustees most worthy without regard to State or Nation, should be admitted to its benefits. The entire will, and the charter as well, indicates that the peculiar solicitude of this testator and of the other founders was to establish a school which should endure for all time. The charter, by express provision, contemplates the building up of an endowment fund, and that only a part of the funds of the Institute should be put into buildings, etc., and that the balance should be invested in perpetuity and the income only used for current maintenance. Both will and charter provide that buildings shall not be commenced until funds to the amount of $200,000 are in hand, and that none of the property of the Institute shall be mortgaged. The will provides further in this clause that (1) no debt whatever shall be created by the Institute; (2) that none of its property shall be pledged; (3) that not more than one third of the funds

of the Institute shall be at any time invested in the grounds, buildings and outfit of the Institute, the other two thirds, shall be kept invested to produce the income necessary for the support of the Institute; and when the income shall be insufficient to pay the expenses of the Institute, such expenses shall be reduced until the income is equal to their payment. Could any provisions go further to preserve this institution in perpetuity? Their wisdom as applied to an educational institution is beyond question. Its property is to remain intact, free from mortgage or pledge. It is to be run on a pay-as-you-go basis. An endowment fund is provided, so that its maintenance can never be crippled. The charter requirement that instruction shall be free and gratuitous necessarily requires a larger endowment than if the instruction was paid for. The history of educational institutions in this country demonstrates the value and necessity of such endowment funds. The creation or increase of such funds has been the purpose and strenuous endeavor of practically all of our large semi-public preparatory schools of the east in recent years. To place this school beyond the need of such effort, and to place the fund above the discretionary use of any board of trustees, was the fixed aim of this testator. The testator helped frame the charter in accordance with the family compact, and he knew that the giving of free and gratuitous instruction would require most generous support from endowment funds. He knew when he made his will what the other members of the family compact had left to the institution, and he knew that he was providing over two thirds of all the funds received from the members of this compact. If our construction preserves the endowment fund it carries out this testator's intention. He incorporated in his will the charter. In a codicil he excluded it. My brethren say that since

this clause in question restates provisions of the charter excepting only the division of the funds of the Institute for buildings, etc., and for endowments, it is a fair deduction that the entire clause was in the nature of comment and advice.   This is a *non sequitur*, and, further, it is based on a mistaken understanding.   The provision as to debts and as to pledging is not in the charter.   The testator has left no room for a speculation as to the reason for excising the charter from his will, for he gives his reason for including it originally and then gives his reason for excluding it: "I have written into my Will," he says in the codicil, "the substance of those provisions of said Act which I consider essential."   The argument that the excision of the charter resulted from the testator's desire not to fetter the institution, seems to conflict with the argument that the inclusion of these provisions in the will is mere comment and advice.   The argument seems to be: the provisions of the charter incorporated in the will, so far as this bequest goes, will be valid and prevent the change of the charter as to them, and the same provisions placed in the will apart from the charter become comment and advice.   When the testator says, I have written into my will the provisions of the charter which I consider essential, could language be clearer or indicate definite intention better?   As to these matters, can it be reasonably said that they are mere advice and comment without ignoring the testator's own expressed statement concerning them?   Will it do to hold that the remaining provisions of this clause, that the provisions as to debts, pledging and dividing the funds, are comment and advice, while the matters copied from the charter are not?   My brethren put them all on the same basis and logical reasoning requires that they stand or fall together.   The fact that the testator restates in his will some of the provisions

of the charter marks his especial interest in them and his imperative intention to create a trust as to them so that his intention can be carried out. Does it not indicate the testator's intention to make this provision indestructible so far as his disposition went? The same argument applies to the following clause as to admissions to the Institute. This, too, is practically copied from the charter. The suggestion that because the testator did not provide that his property should go to his legal representatives in case the Loomis Institute could not legally accept his gift, or did not deem it wise to do so because of the division of the funds, shows that he did not intend to create a trust under this clause in question, is without force. The testator did not contemplate failure for this Institute, and that the Institute might not be able legally to take his gift was probably about as near his thought as that this young educational institution would refuse a gift of one and a half million dollars through fear that the provision that two thirds of the funds should form an endowment fund would some time hamper the future of the institution. Already a million dollars has been expended on buildings, land and equipment. An endowment of a million and a half is a necessity for a school of this high character which gives to its student body free instruction. This is only a part of what might be urged. The matter concerns a public charity. The cause of education can show few, if any, nobler gifts for her sake than this great gift of the Loomis family. They were not thinking of bigness for their Institute. And this testator, outliving his relatives in the compact, profiting by the twenty years' experience which he had had in living with this idea, sought to guard this institution against debt and the depletion of its funds to the destruction of its primary purpose to give "free and gratuitous" instruction. I would

construe this clause so as to carry out his intention and keep this large endowment fund to give to this Institute support and strength in all the years to come and to continue to make it, for this reason, distinctive among like institutions.