[Civ. No. 13167. First Dist., Div. One. 'Mar. 27, 1947.]

Estate of CARL FELDMAN, Deceased. ERNEST MEEZIT, Appellant, v. DR. JASON NOBLE PIERCE, as Executor, etc., Respondent.

Bartley C. Crum for Appellant.
Ernest M. Gibbons for Respondent.

BRAY, J.—Appeal by Ernest Meezit from portions (hereinafter designated) of a supplemental decree of distribution rendered in the estate of Carl Feldman, deceased. The only respondent on the appeal is Dr. Jason Noble Pierce, as executor of the last will and testament of said deceased.

The will of the deceased is holographic. After making certain specific gifts the will provides: "To Ernest Meezit, 60 Mirabel Avenue, San Francisco, Cal, 15 fifteen thousand Dollars, Three thousand for his personal use, and the rest to distribute according to my personal wishes." It is this clause in the will that caused the litigation, as to which litigation the trial judge observed: ". . . this is the most unusual case, I think, in the history of probate law."

The will was admitted to probate, and the administration of the estate continued in the normal way until time for distribution. The court then entered a decree of distribution in which it ordered $3,000 of the $15,000 mentioned in the above clause of the will to be distributed to appellant, and the balance of $12,000 to be impounded until such time as that clause could be interpreted and the further order of the court. Actually the amount impounded was only $11,162.85, as that was the balance left in the estate after paying the other specific legacies, claims and expenses of administration. However, the court frequently, as will hereafter appear, referred to $12,000, instead of the exact sum on hand, and for convenience hereafter we will generally refer to it as $12,000 instead of the specific amount.

Carl Feldman died May 2, 1943, and the will was admitted to probate May 24, 1943. On the Saturday preceding his death, Feldman was ill in the Gordon Hotel. Appellant, his friend, spent the night with him in his room. According to appellant's testimony, Feldman on that occasion requested appellant to distribute moneys to certain named persons. After the death of Feldman, and all during the probating of the estate and even at the time of the making of the decree of distribution above mentioned, appellant did not disclose to anyone what persons the testator intended to receive moneys under the clause "and the rest to distribute according to my personal wishes."

In the petition for distribution the executor called attention to the clause in question, stated that appellant had refused to advise the executor whom the testator intended to be the distributees under that provision of the will, and requested that a citation issue requiring appellant to come into court

and disclose who these persons were. One Alma Loose thereupon filed a pleading denominated "Answer to Petition for Final Distribution" and in it alleged that she was "the undisclosed distributee referred to" in the will and that appellant had "promised to convey" the $12,000 to her, and thereby claimed that sum as a legatee.

On the day after the decree of distribution impounding the $12,000 was filed, appellant filed in the probate proceeding an "Objection to Executor's Report and Petition for Settlement of First and Final Account" verified by him. This is a rather amazing document in view of the later position taken by him and his testimony at the hearing. This states that under the terms and provisions of the will appellant "was bequeathed the sum of Fifteen Thousand ($15,000.00) Dollars, Three Thousand ($3,000.00) of which was for his own personal use and the rest to be distributed according to the testator's personal wishes. Said legatee, Ernest Meezit, denies that he has refused to advise petitioner as to whom the testator intended to be the legatees under said provision of the Will or whether or not said testator's instructions relative thereto were oral or in writing. Said legatee further denies that he evades information relative to the intention of the testator and the executor and in this connection *alleges that there are no known legatees who are to be advised as to their rights and interests in the said Twelve Thousand ($12,000.00) Dollars* . . . that at the time of the execution of said Will on October 12, 1942, no mention was made to him by said testator regarding said legacy, and at no time either prior to the execution of said Will or thereafter did the said legatee, Ernest Meezit, promise or agree either expressly or impliedly with said testator that he would distribute said legacy in accordance with the personal wishes of said testator." (Emphasis added.) The appellant then goes on to pray that the total sum of $15,000 be distributed to him "as his sole and separate property, and that no trust be impressed on the sum of Twelve Thousand ($12,000.00) Dollars or any portion thereof, and that petitioner's request that the status of the Twelve Thousand ($12,000.00) Dollars be determined to be impressed with a trust, be denied."

A citation was issued by the court to appellant directing him to appear on a certain day and reveal to the court "any wishes expressed to him by the testator concerning the distribution of the" $12,000. At the hearing which followed, the

respondent-executor, Alma Loose and appellant Meezit were the only parties of record. At the conclusion of the hearing, the court signed a supplemental decree of distribution in which, after setting forth that the executor in his petition for final distribution had requested that said provision of the will be interpreted by the court for the purpose of ascertaining the intentions of the executor, it is recited that the court had issued a citation to Meezit to appear and reveal to the court any wishes expressed to him by the testator; that the citation came on for hearing on certain days; that testimony was taken from appellant and several other witnesses as to the intentions of the testator as to who the undisclosed beneficiaries were. The court then found that out of the $12,000, Peter Kore should receive $1,000, less inheritance tax of $70, or a balance of $930; Michael A. Kruger, $1,000, less inheritance tax of $70, or a balance of $930; Vera Kreekis, $1,000, less inheritance tax of $70, or a balance of $930; Mary Kreekis, $1,000, less inheritance tax of $70, or a balance of $930; Alma Loose, $2,000, less inheritance tax of $140, or a balance of $1,860; Fritz Cecul, $500, less inheritance tax of $35, or a balance of $465. The court further found that Dr. Jason Noble Pierce should receive the sum of $500 for extraordinary services as executor; E. M. Gibbons, $500 in fees for extraordinary services as attorney for the executor; Leslie C. Gillen, $500 in fees as attorney for Alma Loose; Alfred Del Carlo, $750, and William B. Hornblower, $750 in fees as attorneys for the legatee Meezit; and Dr. Jason Noble Pierce, executor, $77.10 for transcript and court costs advanced.

The court thereupon distributed, and ordered the executor to pay to the executor, legatees and attorneys above mentioned, the amounts which it found they should receive as above set forth. After such payments there was left on hand out of the $12,000 in question $2,040.54, which sum the court ordered distributed and paid equally to the First Congregational Church of San Francisco and Goodwill Industries of San Francisco, who were the residuary legatees in the will. In discussing the case, for clarity, we shall ignore the deduction of inheritance tax from each legatee's share and refer only to the gross sum which he or she would receive before deduction of that tax. It will be noted that the total amount of legacies allowed by the court out of the $12,000 is only $6,500. Then the court from said $12,000 allowed attorneys' fees and executor's fees and court costs in the amount of $3,077.10,

totalling the sum of $9,577.10, being the amount which the court distributed under the disputed clause in the will.

Appellant appeals from the portions of the decree of distribution which ordered to be distributed and paid out of the $12,000 the following sums: $1,000 to Vera Kreekis; $2,000 to Alma Loose, $500 to Dr. Pierce as fees for extraordinary services as executor; $500 to E. M. Gibbons as fees for extraordinary services as attorney for the executor; $500 to Leslie C. Gillen for attorney's fees in representing Alma Loose; $1,020.27 to the First Congregational Church of San Francisco and $1,020.27 to Goodwill Industries of San Francisco, as residuary legatees; and $77.10 to Dr. Pierce, the executor, for court costs advanced; and also from the portion of the decree "wherein the court finds that Vera Kreekis and Alma Loose are undisclosed legatees and beneficiaries of parts of said sum of $12,000 . . . to be distributed according to the testator's 'personal wishes.' "

The grounds of the appeal are that the court failed to distribute the $12,000 according to the wishes of the testator as testified to by appellant, and improperly allowed attorneys' fees, executor's fees and court costs out of that sum.

To understand the manner in which it is claimed the court disregarded the beneficiaries as listed by appellant, it is necessary to discuss at some length appellant's testimony. With certain exceptions which will be hereafter pointed out, appellant is the only person who knows what the testator had in mind when he wrote in his will the phrase "and the rest to distribute according to my personal wishes."

Appellant's testimony is a maze of contradictions, irrelevant answers to the questions asked, failure to answer some questions, garbled English, uncertainties and confusions, which caused the court at one stage of the trial to remark: "I tried to get all the information we could out of this gentleman [Meezit], and everything that took place here is supposed to have taken place between the decedent and Mr. Meezit, but it is so uncertain, so vague, so indefinite, so ambiguous and all that, that no Court could give it any amount of weight or credence to distribute any estate on testimony of that kind. . . . to dispose of it, according to that kind of testimony, no court in the land would do it."

Both testator and appellant were of Latvian origin and had been friends for about twenty years. On the Saturday night preceding the Monday of testator's death, testator was

very sick, but refused to go to a doctor. Testator gave appellant what money he had in his possession and an envelope to be given to Dr. Pierce, the executor. Appellant calls this a "will envelope" and indicates that the testator told him there were two wills, one in the envelope and one in the safe deposit box at the bank. The will in the safe deposit box was the one admitted to probate. It is not clear whether there was a will in this envelope. Appellant's severe language difficulties while testifying may be responsible for this confusion. Testator did not tell appellant what was in the will or wills, and appellant did not know that his own name was in the will until it was opened at the bank after testator's death. That Saturday night, "while I sleep—on the carpets" in the testator's room, the testator mentioned "figures and sums to give some. . . . Then he told me to—he mentioned some persons to whom I should give a specified sum; at the same time, then, he say to use my judgment in every case I give money." When asked whom the testator mentioned by name, appellant testified that the testator wanted appellant to give Peter Kore $1,000, Michael Kruger $1,000, and Fritz Cecul $500. From this point on the testimony is quite confusing, but apparently these were the only persons—with the exception of Mary Kreekis, to whom, appellant later states in his testimony, testator wanted him to give $1,000—whom the testator actually mentioned that night, and as to whom the testator mentioned amounts. After some more confusion in his testimony, appellant produced a list of names and amounts which he had written down on the insistence of his attorney about a month before the hearing and approximately two years after his talk with the testator on the important Saturday night. On that night he had made no note of his conversation with the testator nor list of the persons who were to get money, nor did he make any until he made the list above mentioned. At one point of his testimony he states that he memorized the names of the persons exactly as the testator gave them to him that night. However, it is clear from the testimony, if anything can be clear in such a jumble, that with the exception of the four persons, Kore, Kruger, Cecul and Mary Kreekis, the testator did not give him any names or amounts, but told him to use the money for the benefit of such Latvian friends of appellant's as in appellant's judgment he might wish to help. Appellant testified that testator at no time told him how much money there was to be distributed, nor that the money was mentioned in the will, nor where

appellant was to get the money he was to pay out. In fact, appellant testified that he wondered that night where he was to get the money to pay the persons mentioned by testator.

It is also apparent from the testimony that the persons on the list which appellant produced in court, none of whom, other than the above four, were mentioned by testator, were persons—Latvian with one exception and the Eagles Lodge as another exception—whom appellant, using his judgment as he claimed testator had asked him to, felt needed or would appreciate his help. For example there is listed one Baltgalw for $2,000, whom testator had only met once but who was a long standing friend of appellant's. Again in the list, appellant includes $500 for the Eagles, a lodge of which appellant was a member but testator was not. Appellant testified that the testator told him to give money to "anyone to whom I feel like, to give, who in my life time helped me out"; also, "he [the testator] mention in every case, use my judgment."

The following are the persons and amounts included on the list presented by appellant: Kore, $1,000; Kruger, $1,000; Cecul, $500; Mary Kreekis, $1,000; Miss Washburn (a non-Latvian), $2,000; Blumberg, $1,000; Krawen, $1,000; Baltgalw, $2,000; Semsirg, $1,000; and the Eagles, $500.

Of this list, the trial court allowed the names of and amounts to the first four, who are the four whom appellant testified the testator specifically mentioned that night, and rejected all the others. In addition, the court included two other persons who were not on the list, awarding Vera Kreekis $1,000, and Alma Loose $2,000. Appellant concedes that the court was right in the awards to the first four, but claims it erred in not following the complete list, and also erred in including the two persons not on the list.

As to the four persons on the list whom the court recognized —not only did the appellant testify directly that their names and amounts were given him by the testator, but the fact that they were to get something was corroborated. Michael Kruger testified that in 1942, testator told him, "I let you know I leave money for you when I pass away"; also that the witness was mentioned in his will. Kruger also testified that testator said that he was going to help Mary Kreekis and Vera Kreekis "something for education," although he mentioned no amounts. Testator also mentioned Peter Kore and Fritz Cecul as beneficiaries of his will.

Peter Kore testified that in November or December, 1942, testator told him he was leaving him something in his will, and in Kore's presence, testator told appellant that appellant was provided for in the will and that testator was leaving $1,000 to Peter Kore and a like amount to Mike Kruger.

Mrs. Frances S. Degman, who was given specific bequests of corporate stock in the will, testified that testator told her before he made his last will that he wanted Mike Kruger and Peter Kore to share a part of his estate, and that he had left appellant a sum of money for his own use and some to distribute according to "my instructions."

It is obvious that the trial court, from the maze of contradictions in appellant's own testimony, found as legatees only those persons on the list submitted by appellant who appellant definitely testified were named by testator that Saturday night. As to these testator had told others than appellant that he wanted them taken care of or they were to get something under his will. As to these four, no complaint is made, and there is no appeal from the court's finding; hence the awards to them must stand.

As to the others on the list, from appellant's own testimony and the lack of any other evidence, the court found in effect that the testator did not have them in mind. Appellant's position is that the evidence is uncontradicted that the testator's instructions to appellant to distribute the $12,000 according to "my personal wishes" was for appellant to use his own judgment as to the manner, amount and persons to whom the money was to be distributed. As pointed out, the court held that as to the first four persons on appellant's list, the testator's instructions were specific. There is substantial evidence to support that finding. As to the balance of the money, there is no substantial evidence to support any finding other than that contended for by appellant, to wit, that the "personal wishes" of the testator were that appellant was to use his own judgment as to the manner, amount and persons to whom the money was to be distributed.

Appellant's position is that the testator gave appellant the names of some beneficiaries, but told appellant to use his judgment as to others. While this is inconsistent with the position appellant took in his sworn answer, in which appellant claimed the entire $12,000 for himself, it is the only conclusion a court can reasonably reach from the appellant's own testimony; and as pointed out, there is no other evidence on the subject in the case.

But what about the distribution of that portion of the $12,000 left after deducting the awards as to which there has been no appeal? There were no persons designated, and the testator merely told the appellant to use his own judgment. Does that create a valid trust? *Estate of Ralston,* 1 Cal.2d 724 [37 P.2d 76], is definitely in point and answers the question. In that case the will provided: "I give and bequeath in trust to L. R. Kagarise . . . my entire property at my death, both Real and Personal, wherever this property may be situated, and I hereby give and bequeath to the said L. R. Kagarise absolute authority to dispose of this my entire estate as he may see fit. . . .

"I appoint the said L. R. Kagarise as my executor and administrator of my estate as he has always been my good friend, and I have absolute confidence in his honesty, and will do as well in disposing of my estate as I could if I were still alive."

The will contained no residuary clause.

Contending that the trust attempted to be created by the decedent was invalid and void for uncertainty and that the decedent's estate therefore passed to them in equal shares as his next of kin and only heirs at law, two grandsons commenced a proceeding to determine heirship. The lower court found that the will did not create a trust, but instead of distributing the estate to the grandsons, gave it to the executor personally. On appeal the court held: "We agree with the lower court in so far as it found and concluded that the will failed to impress a trust upon the decedent's property. It is essential to the validity of a trust, whether express or precatory, that the language employed definitely indicate an intention to create a trust, that the subject-matter thereof be certain, and that the object or persons intended to have the benefit thereof be certain. The authorities are legion to this effect. The 'trust' here involved is defective and invalid because of its complete failure to indicate either the object or the persons to benefit thereby.

"We cannot, however, accept the further finding and conclusion that the will 'by its terms gives the entire estate' to the respondent executor. The instrument does not purport to vest the property in respondent executor for his own individual use. On the contrary, it declares that the property is left to the respondent 'in trust.' In view of this expressed intention the property, because of the invalidity of the trust,

passes under the laws of intestate succession and the two grandsons of the decedent, as his next of kin and only heirs at law, are entitled to share equally therein. (*Wittfield* v. *Forster,* 124 Cal. 418, 420 [57 P. 219].)

"There is a well-recognized distinction between an uncertainty where the intent to establish a trust is clear but the provisions are so indefinite as to render the trust void for uncertainty, and the uncertainty which simply indicates the want of intention to create a trust. (*Loomis Inst.* v. *Healy,* 98 Conn. 102 [119 A. 31].) This distinction is discussed in *Pratt* v. *Trustees of Sheppard & E. P. Hospital,* 88 Md. 610 [42 A. 51, 56], wherein the following appears:

" 'But it must be borne in mind that there is a distinction between a trust that is void for uncertainty, and an uncertainty that is simply indicative of the absence of an intention to create a trust. In the one case there is no uncertainty as to the intention to create a trust, but merely an uncertainty as to the objects to be benefited or the subject to be affected; in the other case, there is simply an uncertainty as to whether any trust was intended to be created at all. If it be uncertain as to whether there was an intention to create a trust, it is obviously not the province of the courts to ingraft a trust upon the gift; but, if it be apparent from the whole will that a trust was intended to be established, then the uncertainty as to the objects or the subject of that trust will not indicate that there was no intention to raise a trust, but the uncertainty will avoid the trust attempted to be founded. Where the expressions have been held too vague to show an intention to create a trust, the devisee or legatee retains the property for his own use; but where the intention to create a trust is sufficiently expressed, and yet the objects or the subjects of it are uncertain, the gift fails and the heir or next of kin is let in to the beneficial ownership.

" 'In *Briggs* v. *Penny,* 42 Eng. Reprint, 371, 375, it is declared:

" 'Once establish that a trust was intended, and the legatee cannot take beneficially. If a testator gives upon trust, though he never adds a syllable to denote the objects of that trust, or though he declares the trust in such a way as not to exhaust the property, or though he declares it imperfectly, or though the trusts are illegal, still in all these cases, as is well known, the legatee is excluded, and the next of kin take.' "

The case of *Maught* v. *Getzendanner*, 65 Md. 527 [5 A. 471, 57 Am.Rep. 352], reviews the authorities on the issue here presented.

"In the instant case there can be no doubt as to the testator's intent to create a trust. As already stated, he expressly declared that he left his 'entire property' to the respondent executor 'in trust.' His failure to designate with sufficient certainty the objects or purposes of the trust makes the same invalid and unenforceable. However, his intent being clear that the respondent executor was not to acquire a beneficial interest in the property, it passed upon his death, and, in the absence of a residuary clause in the will, to his next of kin and heirs at law, the petitioners in this proceeding, in equal parts under the laws of intestate succession."

In *Sears* v. *Rule*, 45 Cal.App.2d 374 [114 P.2d 57], the testator left the bulk of her estate to her brother, naming him. The will then went on to provide: " (b) The reason of making my brother, Charles T. Rule, aforesaid, the sole beneficiary of my estate, is that I am confident, and place my trust in him to the extent that he will distribute my estate in accordance with my wishes he and I have often discussed." The court held that the testatrix did not intend to make her brother sole beneficiary of her entire estate. The evidence showed that she intended to give him the property to be distributed to individuals or for the benefit of charitable causes according to an agreement between them. The language of the will did not create a valid trust as it failed to mention the subject, purpose and beneficiary required by section 2221 of the Civil Code. The court on page 379 states: "But if the language of the will, construed in the light of surrounding circumstances, clearly indicates that the testator did not intend to devise his property absolutely, then the will fails to dispose of such property and it must be considered as intestate property which should be distributed to the heirs according to the rules of succession, even though the will may have attempted to create a trust which is void." That appellant cannot prevail upon the theory that in our case this might be a precatory trust is well shown by the following holding in the Sears case, page 380: "It is conceded in the present case that the language of the will is insufficient to create a trust in the residue of the property by the use of precatory terms. We agree with that statement for the reason that it fails to men-

tion the subject, purpose or beneficiaries thereof, as required by section 2221 of the Civil Code, and because the will does not purport to enforce an *imperative obligation* upon the brother of the testatrix to perform any specific acts. (*Wills v. Wills*, 166 Cal. 529 [137 P. 249]; *Estate of Mitchell*, 160 Cal. 618 [117 P. 774]; *Estate of Lee*, 104 Cal.App. 15 [284 P. 948]; *Estate of Browne*, 175 Cal. 361 [165 P. 960]; *Estate of Mooney*, 25 Cal.App.2d 481 [77 P.2d 1098]; 25 Cal.Jur. 288, § 146; 26 Cal.Jur. 973, § 271; 69 C.J. 713, §§ 1830-1832; 1 Restatement of Law of Trusts, 76, § 25; 1 Bogert on Trusts, 223, § 48.) In the authorities last cited it is said that where a testator has made an unrestricted devise of property by the terms of his will, subsequent precatory language will not be deemed to create a trust therein. In the *Estate of Browne, supra,* it is stated that a trust will not be created in the absence of language imposing upon the devisee an imperative obligation to perform specific acts. The early liberal construction of language upholding precatory trusts has been frequently rejected by modern authorities in this and all other jurisdictions. In 1 Bogert on Trusts, it is said in that regard at page 231:

" 'The tide has run so strongly against turning precatory expressions into words of trust that the ordinary words of request, recommendation, wish, and desire are quite generally construed to have no legal effect.' "

Our case is on all fours with the Ralston case. Here there can be no question but that the testator intended to create a trust. He did not intend appellant to get the $12,000 personally for he gave him $3,000 for his personal use. Appellant himself testified in effect that the testator intended to create a trust. The testator wanted all the money distributed according *"to my personal wishes"* (emphasis added), but he failed to express his personal wishes as to a part of that money. As to that portion of the money his failure to designate with sufficient certainty the objects or purposes of the attempted trust makes it invalid and unenforceable. His intent being clear that appellant was not to acquire a beneficial interest in that portion of the fund, and there being a residuary clause in the will in question (differing from the situation in the Ralston case), it goes to the residuary legatees under the will, to wit, the First Congregational Church of San Francisco and Goodwill Industries of San Francisco.

We now come to the persons not on appellant's list whom the court made legatees in the decree of distribution. As pointed out in *Estate of Ralston, supra,* and *Sears* v. *Rule, supra,* the language used by the testator is not sufficient to create a valid trust. But there is another reason why, in no event, were the awards to these persons proper, and that is, that the evidence fails to support such awards. Whether or not they were included in the ''personal wishes'' of the testator is a question of fact to be determined from the evidence. If there was substantial evidence to support the trial court's finding that they were so included, this court would be bound by the court's finding. However, an exhaustive search of the transcript finds no evidence that would support the court's finding as to these persons. Neither of these persons has seen fit to file a brief in support of her award.

### The Vera Kreekis Award

The first is Vera Kreekis, to whom the court awarded $1,000. She is the older sister of Mary Kreekis, who was on appellant's list for $1,000. Appellant very strenuously denied that the testator ever told him to give Vera anything. He was questioned several times on the subject and each time was very positive that the testator had never included her in the persons to whom money was to be given, although testator did instruct him to give her sister Mary the sum of $1,000. Mrs. Degman testified that before he made his last will, testator told her that appellant had asked him to leave a sum of money to the two daughters of Mrs. Kreekis (Mary and Vera) for their education, but Mrs. Degman was not asked what reply testator made to that request, nor does she testify that testator ever said he was going to give these girls anything. Michael Kruger testified that the testator told him that he was going to help Vera and Mary Kreekis, by giving them something for their education. However, no sum was mentioned.

Mrs. Alvine Kreekis testified that before testator's death appellant came to her and said that he was sent by testator to get the correct names of her daughters as testator wanted to leave them a certain amount for their education. Appellant mentioned $500 for Vera (and the court awarded her $1,000) ; $1,000 for Mary and $500 for the witness. Mrs. Kreekis then goes on to testify that there was some discussion between her and appellant about appellant's marrying the

older daughter. The witness testified that after testator's death, appellant offered $1,000 to buy an engagement ring and stated that he would provide for her last year in college if she would marry him. After testator's death appellant only mentioned the $1,000 Mary was to get and did not mention any more about the $500 to Vera. There was some mention, too, of appellant's marrying Mary, but the witness did not know whether he was serious or joking. The witness had talked to testator, who seemed interested in the girls, and wanted to know about their progress in school and what they intended to do. But the witness nowhere in her testimony claims that testator ever mentioned any specific amount to go to her daughters or even that he had said that he was going to give them any money whatever. Appellant denied flatly ever telling Mrs. Kreekis that the testator was going to leave $500 or any sum either to Vera or to Mrs. Kreekis.

The situation then is this—that appellant, who is the only one who knows what the "personal wishes" of testator were, denies that they ever included $500 or $1,000 (the amount which the court awarded) for Vera Kreekis, or that he was told to give her anything. The cross-examination of appellant on the subject of Vera Kreekis attempted to get appellant to admit that the testator had instructed him to give her some sum of money, but because one of the Kreekis girls would not marry him, appellant was not carrying out the wishes of the testator. However, appellant denied this, and there is no evidence upon which the court could base such a finding. There is no testimony in the case upon which the court could award Vera any sum whatever, much less the $1,000 which it did award.

### The Alma Loose Award

The court awarded Alma Loose the sum of $2,000. Nowhere in the record is there the slightest justification for this. Alma Loose was employed in the hotel where the testator resided. She claimed that over a period of years she had rendered many services for him; that he had offered to buy the hotel for her; that he would put up the money and then "off and on you can give me a few dollars." She declined. She testified that the testator had told her often that when he died she would never have to work again; that he would put her in his will. Hers was the only testimony on the subject. It is interesting to note that Mrs. Loose filed a claim against

the estate in the sum of $24,000 for alleged services rendered to the testator by her during his various illnesses. This claim was settled for $1,500.

Counsel for Mrs. Loose tried very hard to get appellant to admit that testator had included her among the beneficiaries to whom appellant was to give money, but appellant vigorously denied that the testator had ever suggested his giving her anything. It did appear on the cross-examination of appellant that, during the negotiations for the settlement of Mrs. Loose's $24,000 claim, appellant had suggested that $300 be taken out of the $12,000 and paid to her, and if necessary she be paid $500. Appellant denied that these sums were offered because he was supposed to treat her as a beneficiary of the will. There is no testimony whatever that Mrs. Loose was to receive $2,000, or any other sum, other than Mrs. Loose's own statement that she was to be remembered in the will. How the court decided to award her any sum, much less $2,000, it is impossible to determine. Alma Loose's testimony, if true, does not establish a right to an award of $2,000. It is interesting to contrast her story on the witness stand with her claim for $24,000 for services to the decedent, and her sworn answer in which she claims that she is "the undisclosed distributee" referred to in the will and entitled to the entire $12,000. Even though testator told Mrs. Loose he was going to mention her in his will, that would not be sufficient to entitle her to an award here, unless testator instructed appellant that that was a part of his "personal wishes." Appellant denied that he was so instructed and there is not one scintilla of evidence to the effect that he was so instructed.

### Extraordinary Fees of Executor and His Attorney

The court found that the executor and his attorney had rendered extraordinary services and allowed them each a fee of $500 to be paid out of the $12,000. Appellant objects to this award. The finding on this subject in the decree of distribution does not state what these services consisted of, whether for extraordinary services rendered in connection with the general administration of the estate, or merely in connection with the proceeding for the supplemental decree of distribution. If for the former, there is no question but that they are allowable. If for the latter, there would appear here special circumstances justifying such an allowance. In

the ordinary estate, the duties of the executor and his attorney end with the obtaining of the decree of distribution, and the payment to the heirs and legatees of their distributive shares set forth therein. But in this case, due to the fact that appellant had declined to disclose to the executor who the legatees were, it was necessary to impound certain sums, have a citation issued to appellant to come into court, and then to have a two-day hearing to enable the court to interpret the will, so that the estate could be finally closed and the executor and attorney wind up their services to the estate. Under this court's determination of this appeal, these fees are really being paid out of the residue of the estate, and not out of any legacy in the will. ██ While ordinarily the executor and his attorney are not interested in and cannot litigate the claims of one set of legatees against the others at the expense of the estate, here, due to the particular situation evolved by the failure of appellant to disclose the names of alleged legatees, and the necessity of the executor obtaining an order to close the estate, and an interpretation of the court of the will (no one else having asked for it or appearing to be intending to) the case comes within the ruling in *Estate of Murphy,* 145 Cal. 464, 467 [78 P. 960]. That case holds that this rule has well defined limitations and that "wherever an order or decree involves a construction of the proper exercise of the duties of the officer, wherever it presents a question as to the right or power of the 'executor' to comply with it the rule does not operate." ██ The circumstances of our case bring the executor and his attorney within the following language in section 902 of the Probate Code (the section which provides for the payment of extraordinary services to such persons) : "Such further allowances may be made as the court may deem reasonable for any extraordinary services, such as . . . such other litigation or special services as may be necessary for the executor or administrator to prosecute, defend, or perform." The same ruling would apply to the sum advanced by the executor for court costs.

### *Attorneys' Fees to Appellant's Attorneys*

██ Respondent calls attention to the fact that the trial court awarded the then attorneys for appellant, $1,500 out of the $12,000 for their fees in representing appellant at the hearing. This appeal is from specified portions of the decree of distribution only. Naturally, appellant did not appeal from, nor is he complaining about this award. The respon-

dent likewise did not appeal therefrom, nor did anyone else, particularly the residuary legatees who are the ones most affected by it. Respondent states in his brief: "When the appellant asked that the case be reviewed he naturally wanted the whole questions involved determined by the Court, which would include the attorney's fees for appellant. . . ." Unfortunately this is not the case. We can only consider the questions which are properly before us, and this question is not. Therefore, we cannot pass upon its validity. In declining to pass upon the question because there is no appeal concerning it, our action should not be construed as an approval of its validity nor a determination that the fees were properly awarded.

### Attorney's Fees to the Attorney for Alma Loose

The trial court awarded Mrs. Loose's attorney $500 to be paid out of the $12,000. On just what theory that award is based does not appear. Under the law, the attorney for a legatee or claimant must look to his client for payment of his fees and not to the estate. Even if the court had been correct in making Mrs. Loose a legatee of a portion of the $12,000, it would have no authority to take more moneys out of that fund to pay her attorney. She would have to pay him from the moneys coming to her. Under any theory, as Mrs. Loose is not entitled to the award made her, her attorney likewise is not entitled to the award made him. *Estate of Walden*, 174 Cal. 776 [164 P. 639], holds that the attorney for an unsuccessful claimant to heirship in an estate is not entitled to attorney's fees even though it is claimed that the services rendered aided the successful claimants and also aided in defeating other claimants.

In view of the foregoing, the following order is hereby made:

(a) The awards to Dr. Pierce for extraordinary services as executor and of certain court costs, and to E. M. Gibbons for extraordinary fees as attorney for the executor, are hereby affirmed.

(b) The awards of $1,020.27 to the First Congregational Church of San Francisco and of $1,020.27 to Goodwill Industries of San Francisco as residuary legatees are hereby affirmed.

(c) Those portions of the order appealed from, finding that Vera Kreekis and Alma Loose are legatees and beneficiaries under the will of the testator, and ordering payment to them of certain sums respectively, are hereby reversed.

(d) That portion of the order appealed from awarding certain sums to Leslie C. Gillen for attorney's fees in representing Alma Loose, is hereby reversed.

(e) The decree of distribution is modified to provide that all sums remaining from the $12,000 after payment of all sums properly deductible therefrom shall be paid to the residuary legatees, the First Congregational Church of San Francisco and Goodwill Industries of San Francisco, in equal proportions. In the interests of justice, the costs of this appeal shall be borne by the estate.

Peters, P. J., and Ward, J., concurred.